**In re STATE of Texas ex rel. David P. WEEKS.**

**Nos. AP–76,953, AP–76,954.**

Court of Criminal Appeals of Texas.

Jan. 16, 2013.

Jane Starnes, Assistant Attorney General, Austin, TX, for Relator.

Richard E. Wetzel, Lisa C. McMinn, State's Attorney, Austin, TX, for State.

KELLER, P.J., delivered the opinion of the Court in which MEYERS, JOHNSON, KEASLER, HERVEY, COCHRAN and ALCALÁ, JJ., joined.

The present mandamus action arises from a capital-murder prosecution that has reached the jury-charge portion of the guilt stage of trial. The trial judge's proposed charge would submit to the jury the "conspiracy" theory of the law of parties[1] but not the "intent to promote or assist" theory of the law of parties.[2] Moreover, in submitting the "conspiracy" theory, the trial judge's proposed charge would require the State to prove that the defendant should have anticipated the particular manner and means by which his co-conspirator killed the victim. The State seeks the issuance of a writ of mandamus to require the submission of the "intent to promote or assist" theory of the law of parties and to require the submission of the "conspiracy" theory of the law of parties without any manner-and-means restriction. We conditionally grant relief.

## I. BACKGROUND

### A. Trial

John Ray Falk, Jr. and Jerry Duane Martin escaped from prison, and during that escape, Susan Canfield, a prison guard, was killed. Martin has been convicted of capital murder for his role in the killing, and that conviction was recently affirmed by this Court.[3] Falk is currently

---

1. See Tex. Penal Code § 7.02(b).

2. See id., § 7.02(a)(2).

3. See In re State ex rel. Weeks, 392 S.W.3d 280, 283, 2012 WL 6218205 (Tex.App.-Waco 2012) (discussing Martin's case); see also Martin v. State, No. AP–76,317, 2012 WL 5358862, 2012 Tex.Crim.App. Unpub. LEXIS 1160 (October 31, 2012) (not designated for publication).

being prosecuted for his role in the incident. According to excerpts of testimony from the court reporter's record in Falk's case,[4] Canfield was on horseback, attempting to prevent Falk and Martin from escaping, when Falk jabbed a stolen revolver into Canfield's side and obtained her rifle. After disarming Canfield, Falk backed away. As Falk was backing away, Martin drove a pickup truck into Canfield and her horse—causing injuries that ultimately led to her death. Falk then jumped into the truck, and the truck sped away.

In deciding to omit instructions on the "intent to promote or assist" theory of the law of parties, Judge Kenneth Keeling, the trial judge, stated that Falk was already "on down the road" when his co-defendant struck the complainant with a vehicle, and therefore, Judge Keeling did not see any evidence to support inclusion of the instruction:

> [U]nder 7.02 parties, 7.02(a)(2), I do not see any evidence where he—this is talking about John Falk, Jr. This is the aiding, abetting part of the driving the vehicle into Canfield or her horse. I don't see any evidence where he solicited, encouraged it, directs it, aids it, or attempts to aid the other person to commit the offense of driving the vehicle into the horse or her. So I don't think you can go under 7.02(a)(2) of the parties statute. The evidence, as I recall it, particularly from Mr. Isaacs—and there was another witness who was under the shed, I can't remember his name, but they testified, as I recall, that Mr. Falk had already gotten the rifle and that he was on down the road at the time of the collision of this vehicle and Mrs. Canfield, okay?[5]

With respect to the conspiracy theory of the law of parties, Judge Keeling's proposed instructions would apply the law to the facts as follows:

> You must determine whether or not the State has proved, beyond a reasonable doubt, four elements. The elements are that:
>
> 1. in Walker County, Texas, on or about September 24, 2007, JOHN RAY FALK, JR. joined a conspiracy with JERRY MARTIN to commit the felony offense of Escape; and
>
> 2. in an attempt to carry out this conspiracy, JERRY MARTIN intentionally or knowingly caused the death of SUSAN CANFIELD by striking her with a deadly weapon, to wit: a motor vehicle or by striking the horse she was riding with a deadly weapon to wit: a motor vehicle that in its manner of use was capable of causing death or serious bodily injury; and
>
> 3. the murder, if any, was committed by JERRY MARTIN in furtherance of the conspiracy, if any, to commit the felony offense of Escape; and
>
> 4. JOHN RAY FALK, JR. should have anticipated that JERRY MARTIN would intentionally or knowingly cause the death of SUSAN CANFIELD *by striking her with a deadly weapon, to*

---

**4.** The court of appeals received rough-draft record excerpts containing the testimony of prison guards Larry Grissom and Joe Jeffcoat. The State has since obtained, and presented to us, certified copies of this testimony. Our review reveals no material difference in content between the rough draft and certified copies.

We note that the court of appeals did not cite to the rough-draft record excerpts that were before it, but "[b]riefly, and for background purposes only," the court of appeals set out some of the events as described by our opinion in Martin's case. *Weeks*, 392 S.W.3d at 283; *see also Martin*, 2012 WL 5358862, at 2–3, 3–4, 2012 Tex.Crim.App. Unpub. LEXIS 1160, at 5–6, 9. This recitation of the evidence from *Martin* does not differ materially from the evidence contained in the record excerpts in Falk's case.

**5.** *See Weeks*, 392 S.W.3d at 286.

*wit: a motor vehicle or by striking the horse she was riding with a deadly weapon, to wit: a motor vehicle that in its manner of use was capable of causing death or serious bodily injury during the commission of felony escape, if any, which was the subject of the alleged conspiracy.*[6]

The State's complaint with respect to the conspiracy instructions is that the italicized language in element four is not required and improperly increases the State's burden of proof.

## B. Court of Appeals

The State filed a petition for writ of mandamus with the Waco Court of Appeals. Rejecting the State's claim with respect to the "intent to promote or assist" theory of the law of parties, the court of appeals concluded that Judge Keeling's "assessment of the evidence to determine whether it supports the inclusion of an instruction under section 7.02(a) in the court's charge is *not* a ministerial act, but rather is an exercise of [his] judgment and judicial determination" and "to the extent that there is a dispute about the state of the evidence, we may not resolve it in an original mandamus proceeding."[7]

With respect to the State's complaint about the proposed conspiracy instructions, the court of appeals acknowledged that "[n]o party to this proceeding has cited any authority that specifically supports the inclusion in the fourth element that the State must prove that Falk should

have anticipated the specific manner and means by which Martin caused the death of Canfield, nor has our research located any."[8] "But," the court of appeals concluded, "there is likewise no specific authority that the inclusion of the manner and means in the fourth element of section 7.02(b) conspiracy is erroneous."[9] From this, the court of appeals further concluded that the issue was not well-settled law such that Judge Keeling had a ministerial duty to omit the language in the application paragraph of the jury charge.[10] But in a footnote, the court of appeals expressed the following reservation to its conclusion:

While we conclude that the law is not "well-settled" on this specific issue, which appears to be one of first impression under Texas law, we are of the strong opinion, based on the authorities cited above, that Texas law does not support including in the fourth element that the State must prove that Falk should have anticipated the specific manner and means by which Martin caused the death of Canfield. Irrespective of the indictment's manner-and-means allegation, no statutory or case law supports its inclusion. Furthermore, two of the recognized criminal pattern jury charge books do not include it.[11]

## II. ANALYSIS

### A. Mandamus Standards

██ In addressing whether a relator is entitled to mandamus relief against a

---

6. *See id.* at 287–88 (emphasis in *Weeks* ). We note that Judge Keeling's application instructions concerning coconspirator liability (except for the italicized portion and the unnecessary phrase "if any") follow the format set out in the Texas Criminal Pattern Jury Charges: Crimes Against Persons, § C4.5, at 72–74 (State Bar of Texas 2011). This modern format may assist both the members of the jury and the advocates who must explain the jury instructions to the jury.

7. *Weeks,* 392 S.W.3d at 286–87.

8. *Id.* 392 S.W.3d at 289.

9. *Id.*

10. *Id.* 392 S.W.3d at 289–90.

11. *Id.* 392 S.W.3d at 290 & n. 8.

court of appeals that has denied mandamus relief against a trial court, we decide *de novo* whether the relator was entitled to mandamus relief against the trial court.[12] To be entitled to mandamus relief, the relator must show two things: (1) that he has no adequate remedy at law, and (2) that what he seeks to compel is a ministerial act.[13]

With respect to the "no adequate remedy at law" requirement, we have said that a remedy at law, though it technically exists, "may nevertheless be so uncertain, tedious, burdensome, slow, inconvenient, inappropriate, or ineffective as to be deemed inadequate."[14]

■ The ministerial-act requirement is satisfied if the relator can show a clear right to the relief sought.[15] A clear right to relief is shown when the facts and circumstances dictate but one rational decision "under unequivocal, well-settled (i.e., from extant statutory, constitutional, or case law sources), and clearly controlling legal principles."[16] Although we have sometimes suggested that a legal issue's status as one of first impression meant that the law was not well-settled,[17] we have since clarified that an issue of first impression can sometimes qualify for mandamus relief.[18]

■ At least two of our mandamus cases—*Patrick* and *Poe*—contain dissents that were predicated at least in part upon the fact that the issue was one of first impression.[19] One lesson from *Patrick* and *Poe* is that an issue of first impression can sometimes qualify for mandamus relief when the factual scenario has never been precisely addressed but the principle of law has been clearly established.

---

12. *Bowen v. Carnes*, 343 S.W.3d 805, 810 n. 6 (Tex.Crim.App.2011) ("The State ... argues that it is the court of appeals's denial of mandamus relief that we should be reviewing rather than the respondent's ruling directly.... [I]n practice it makes little difference whether we purport to review the court of appeals's mandamus ruling or the trial court's order.... Either way, we review the appropriateness of the trial court's conduct.... essentially by undertaking a 'de novo application of the two pronged test' for mandamus relief.")

13. *In re State ex rel. Tharp*, 393 S.W.3d 751, 751–54, 2012 WL 5499867 at *2 (Tex.Crim.App.2012); *Bowen*, 343 S.W.3d at 810.

14. *Greenwell v. Court of Appeals for the Thirteenth Judicial Dist.*, 159 S.W.3d 645, 648–49 (Tex.Crim.App.2005); *see also Tharp*, 393 S.W.3d at 754 & n. 8 (citing *Greenwell*).

15. *Bowen*, 343 S.W.3d at 810.

16. *Id.*

17. *See Banales v. Court of Appeals for the Thirteenth Judicial Dist.*, 93 S.W.3d 33, 36 (Tex.Crim.App.2002); *State ex rel. Hill v. Court of Appeals for the Fifth Dist.*, 67 S.W.3d 177, 181 (Tex.Crim.App.2001); *State ex rel. Hill v. Court of Appeals for the Fifth Dist.*, 34 S.W.3d 924, 928–29 (Tex.Crim.App.2001).

18. *State ex rel. Rosenthal v. Poe*, 98 S.W.3d 194, 199–203 (Tex.Crim.App.2003) (State had a clear right to relief to prohibit camera from being in the jury room though issue had never been addressed before by this Court); *State v. Patrick*, 86 S.W.3d 592, 594–96 (Tex.Crim. App.2002) (absence of jurisdiction for what trial judge ordered); *See also Poe*, 98 S.W.3d at 219–20 (Keller, P.J., dissenting) (acknowledging two situations in which an issue of first impression could be a basis for mandamus relief).

19. *Patrick*, 86 S.W.3d at 598 & n. 2, 600 & n. 12 (Cochran, J., dissenting) (noting earlier case suggesting that mandamus is unavailable when the issue is one of first impression); *Poe*, 98 S.W.3d at 219–21 (Keller, P.J., dissenting) (acknowledging two situations in which an issue of first impression can be a basis of mandamus relief but contending that the case fell within neither of those situations), 221 (Keasler, J., dissenting) (contending that the Court has "created law where there is none").

## B. No Adequate Remedy at Law

Before the court of appeals, the parties did not dispute that the State had no adequate remedy at law because it could not appeal the trial judge's decision.[20] Falk and Judge Keeling contend, however, that the State now has an adequate remedy at law because Judge Keeling has agreed to reconsider his rulings. The factual basis for this contention is an email written by the judge, which states in relevant part:

> I am willing to have a hearing on the state[']s motion, defense motions and anything else about this case on Monday morning at 9:00 a.m. in Brazos County, if all of the attorneys can be present. PROVIDED, there are no proceedings pending in the Court of Criminal Appeals or any other court of appeals. PROVIDED FURTHER, that the case can be argued upon completion of the hearing.

█ In essence, Judge Keeling's email requires the State to abandon its mandamus action in exchange for a reconsideration that affords the State no guarantee that the earlier rulings will be changed. If the State accepted Judge Keeling's offer and Judge Keeling ultimately decided to let his earlier rulings stand, then the State would lose any ability to have that decision reviewed. We do not agree with Judge Keeling that his proposed course of action constitutes an adequate remedy for mandamus purposes.[21]

Falk also contends that the State has an adequate remedy because it can raise a cross-point if Falk is convicted and appeals.[22] Whether Falk will be convicted, and if so, whether he will appeal, is speculative. This remedy is too uncertain to constitute an adequate remedy.[23]

## C. Ministerial Duty

### 1. *The State's Entitlement and the Law of Parties*

█ The trial court is required to give the jury a written charge "setting forth the law applicable to the case."[24] In *Grey v. State*, we explained that "the State is entitled to pursue the charged offense and, therefore, is entitled to receive a response from the jury on whether the defendant is guilty of the charged offense."[25] "It is the State," we said, "that chooses what offense is to be charged."[26] The State's charging choices, then, become part of the law applicable to the case.

With regard to offenses other than the charged offense, we have held that the State's power to choose what offense to pursue meant that the State was not required to prove that the defendant was guilty only of the lesser-included offense in order to obtain submission of the lesser-included offense.[27] The State could pursue the charged offense alone, or the State could also obtain instructions on a lesser-included offense, or the State could abandon the charged offense altogether in favor of prosecuting the lesser-included of-

---

20. *Weeks,* 393 S.W.3d at 284–85. *See also Tharp,* 393 S.W.3d at 754 & n. 8; *Greenwell,* 159 S.W.3d at 648–49 ("potential review at a later time is not always or automatically an adequate remedy").

21. *See Tharp* and *Greenwell, supra.*

22. *See* Tex.Code Crim. Proc. art. 44.01(c).

23. *See Greenwell, supra.*

24. Tex.Code Crim. Proc. art. 36.14.

25. 298 S.W.3d 644, 649–50 (Tex.Crim.App. 2009).

26. *Id.* at 650.

27. *Id.*

fense.[28] It was the State's prosecution, so it was the State's choice.

This concept—that the State chooses what offense to pursue—also applies to legal theories available to prove the charged offense. For example, it cannot be seriously maintained that the trial judge could refuse altogether to submit a charged offense to the jury when the evidence supports its submission and no legal reason otherwise exists to preclude its submission. Likewise, one cannot seriously maintain that the trial judge could arbitrarily refuse to submit an alternative statutory method of committing the offense if that method were in the charging instrument and supported by the evidence.

■■■■ The same is true with respect to the law of parties. Regardless of whether it is pled in the charging instrument, liability as a party is an available legal theory if it is supported by the evidence.[29] In the watershed case of *Malik v. State*, our formulation of the standard for sufficiency of the evidence as based on the "hypothetically correct jury charge" was motivated in part by the existence of issues such as the law of parties and the doctrine of transferred intent.[30] Party liability is as much an element of an offense as the enumerated elements prescribed in a statute that defines a particular crime.[31] If party liability can legally apply to the offense at issue and is supported by the evidence,

then the State is entitled to its submission.[32]

■■■■ We also explained in *Malik* that the hypothetically correct jury charge is one that "does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability." [33] This statement is consistent with the fact that it is the State's prosecution, and the State is entitled to pursue any available theories of criminal liability to the broadest extent possible under the charging instrument and the evidence. If multiple theories of party liability are supported by the evidence, the trial judge may not arbitrarily limit the State to one of the theories. And the trial judge may not restrict the presentation of a theory of party liability if the restriction is not required by the charging instrument or by the evidence.

### 2. § 7.02(a)(2)

■■■■ By virtue of § 7.02(a)(2), a person is criminally responsible for the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." [34] The trial judge stated that there was no evidence that Falk engaged in any conduct that solicited, encouraged, aided, or attempted to aid "in driving the vehicle into Canfield or her horse" because Falk was already down the road at the

28. *Id.*

29. *Marable v. State*, 85 S.W.3d 287, 287–88 & n. 3 (Tex.Crim.App.2002).

30. 953 S.W.2d 234, 239–40 (Tex.Crim.App. 1997).

31. *See* Tex. Penal Code § 7.02; *Malik, supra.*

32. Tex.Code Crim. Proc. art. 36.14 (trial judge must give jury written charge "setting forth

the law applicable to the case"); *Romo v. State*, 568 S.W.2d 298, 302 (Tex.Crim.App. 1978) (opinion on State's motion for rehearing) ("In a case where a charge on the law of parties is applicable, it is usually the State that insists on and is entitled to have such a charge, including an application of the law to the facts, submitted to the jury.")

33. 953 S.W.2d at 240.

34. Tex. Penal Code § 7.02(a)(2).

time of the collision. We take this to mean that the trial judge believed that the evidence showed that Falk was a significant distance away when Canfield was hit. But, first, the offense, within the meaning of § 7.02(a), is not "driving the vehicle into Canfield or her horse." The offense is capital murder. Second, no one disputes that there was evidence that Falk disarmed Canfield.[35] Regardless of the distance between Falk and Canfield at the time of the collision, a rational trier of fact could conclude that the act of disarming Canfield aided Martin's commission of capital murder.[36] By focusing on the credibility and weight of the State's evidence, Judge Keeling converted a matter-of-law determination based on the existence of some evidence to support a liability theory into a factual finding on the reasonableness of the State's theory. This ruling by the trial judge is contrary to established law that requires the trial court to instruct the jury on the law applicable to the case, including all theories of liability requested by the State for which there is some evidence in the record.

▪▪▪▪ We are not persuaded otherwise by the court of appeals's conclusion that the trial judge's assessment of the availability of a parties instruction under the evidence is a judicial determination or that we may not, on mandamus, resolve a dispute about the state of the evidence. The trial judge's task in a jury trial is not to determine whether the State is correct that the defendant is liable under the law of parties. Rather, the trial judge's task is simply to determine whether the evidence raises the issue. It is up to the jury to resolve conflicts in the evidence.

### 3. § 7.02(b)

Under § 7.02(b), a person is criminally responsible for the conduct of another if "in an attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators . . . if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy."[37] The trial judge's proposed charge includes a § 7.02(b) instruction, but, in applying the law to the facts, it requires the State to show that Falk should have anticipated the specific method by which Canfield was killed. Whether that application of the law to the facts was properly included in the jury charge depends upon whether it would be part of an evidentiary-sufficiency review because, as we have discussed

---

35. In his comments at the jury-charge conference, quoted by the court of appeals, *see* this opinion, *ante*, Judge Keeling acknowledged that appellant took the rifle from Canfield. In addition, this fact was supported by Grissom and Jeffcoat's testimony. For this reason, we need not address the argument that Judge Keeling now makes that the State has submitted some portions of the trial record that were not before the court of appeals.

36. The remaining question would be whether the evidence supports the proposition that Falk, in disarming Canfield, intended to promote or assist Martin's murder of her. Judge Keeling has not suggested that Falk's intent could not be inferred from the evidence. "Indeed, mental culpability is of such a nature that it generally must be inferred from the circumstances under which a prohibited act or omission occurs." *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex.Crim.App.1991).

Of course, the evidence might also support some other actions by Falk that a jury could find constituted encouragement, aid, or an attempt to aid. For this reason, the jury instructions do not single out specific evidence. Instead, the jury instructions simply ask the jury to determine whether the defendant did encourage, aid, or attempt to aid the other person. *See, e.g.*, Texas Criminal Pattern Jury Charges: Crimes Against Persons, § C4.4, at 67–70 (State Bar of Texas 2011).

37. TEX. PENAL CODE § 7.02(b).

above, the jury charge must reflect what the State is required to prove.

 Well-established evidentiary sufficiency principles demonstrate that the State is not required to prove that a defendant should have anticipated the specific method by which a person was killed in a capital-murder prosecution. We have explained that the method by which someone commits a murder is not relevant to evaluating the sufficiency of the evidence to support a conviction.[38] No statute prescribes the method by which death is caused in a capital murder,[39] and because capital murder, like murder, is a "result of conduct" offense,[40] the particular way in which a capital murder is accomplished does not even prescribe the allowable unit of prosecution.[41] And, if what is at issue is "a non-statutory allegation that has nothing to do with the allowable unit of prosecution," then the allegation "cannot be a basis for saying that the proved offense is different from the one that was pled."[42] Because the State is not bound to prove such an allegation, the allegation should not be a part of the jury charge, because, as we have explained above, the State is entitled to the broadest submission of its theories of liability that are authorized by the charging instrument and supported by the evidence.

We think that the court of appeals understood this, as it expressed its "strong opinion" in a reservation about its holding. Although no case specifically holds that the State need not prove that the defendant should have anticipated the particular method by which a murder was committed to show liability under § 7.02(b) in a capital-murder case, the combined weight of our precedents clearly establishes that proposition.

## D. Disposition

We conditionally grant mandamus relief and order the court of appeals to grant mandamus relief directing Judge Keeling to submit the § 7.02(a)(2) theory of party liability in the jury charge and to submit the § 7.02(b) theory without requiring the State to show that Falk should have anticipated the particular method by which the murder was carried out. The writ of mandamus will issue only in the event that the court of appeals fails to comply with this opinion.[43] No motion for rehearing will be entertained.

PRICE, J., filed a dissenting opinion in which WOMACK, J., joined.

PRICE, J., filed a dissenting opinion in which WOMACK, J., joined.

## I.

Mandamus is an extraordinary remedy. To intercede in an ongoing capital murder trial and order the trial court to give a particular jury instruction that we believe is raised by the evidence, and modify another jury instruction because we think the trial judge has misconstrued the law, is extraordinary indeed. Shall we interrupt

---

**38.** *Johnson v. State*, 364 S.W.3d 292, 296 (Tex.Crim.App.2012).

**39.** Statute does prescribe alternative culpable mental states and alternative sets of circumstances in which a murder might occur, *see* TEX. PENAL CODE § 19.02(b), and alternative aggravating factors for capital murder. *See id.*, § 19.03.

**40.** *Louis v. State*, 393 S.W.3d 246, 251, 2012 WL 2007632 at *5 (Tex.Crim.App.2012); *Rob-*

*erts v. State*, 273 S.W.3d 322, 329 (Tex.Crim. App.2008).

**41.** *Johnson*, 364 S.W.3d at 295–96.

**42.** *Id.* at 298.

**43.** We dismiss the State's petition for writ of prohibition.

the next capital trial because we think the trial judge has made a legal mistake in admitting certain evidence, or in failing to admit it? Or in granting a continuance; or failing to grant it? In allowing a capital murder defendant to represent himself, or failing to allow it? Or a hundred other scenarios that routinely present themselves in the course of a capital ligation (or any other criminal trial)? Where will it end?

When defendants seek our interlocutory involvement in such matters, this Court usually declines to intrude, typically refusing even to grant leave to file their applications for mandamus relief. After all, if the trial court makes a mistake in the defendant's eyes, he can ultimately vindicate that mistake in the ordinary course of direct appeal if he is convicted. Because the State's right to appeal is limited, however, the Court sometimes seems more solicitous of its mandamus applications— more willing to interrupt proceedings below and at least file and set the matter for a considered decision. We understandably fear that a trial court's mistake of judgment that cuts against the State's interest may result in an unjust acquittal, and this apparent windfall to the defendant exerts a subtle pressure on the Court to rectify the situation that is all but irresistible. The danger is that we should forget that the necessity for a mandamus applicant to demonstrate he has no adequate remedy to redress the wrong he alleges is but the first prong of the two-prong standard that serves to insure that mandamus is not wantonly invoked to interfere unduly with the ordinary course of judicial proceedings. We run the risk of inadvertently diluting the second prong—the requirement that what the applicant seeks to enforce by our higher authority constitutes a manifestly ministerial act, not a judicial one.

To be sure, we have often characterized a judicial act as "ministerial" for mandamus purposes when the undisputed facts and circumstances informing it can admit of "but one rational decision under unequivocal, well-settled (i.e., from extant statutory, constitutional, or case law sources), and clearly controlling legal principles."[1] This is meant to be a rigorous standard, however, which should not be invoked to justify routine intrusions in trial-level judicial decisions that seem incorrect to us, or even manifestly incorrect, at least so long as the mistakes occur in the exercise of judicial, not ministerial, functions.[2] That the line separating the two is often indistinct is nothing new. But if we are to err in the exercise of our discretionary mandamus authority, it seems to me, we should make a point of trying to err on the side of non-intrusiveness, even when the State seeks relief that is otherwise unavailable to it in order to avert an apparent injustice. As Judge Meyers, joined by three other judges, forcefully observed almost twenty years ago:

> Plainly, it is the policy of our Legislature that the State not be permitted to appeal judicial rulings in criminal cases except under those circumstances expressly permitted by statute. *See* Tex. Code Crim.Proc.Ann. art. 44.01 (West Supp.1993). If a statute does not allow the appeal of a ruling, then the exercise of our extraordinary writ jurisdiction to review it frustrates the evident design of our statute law, brazenly seizing from the legislative department ultimate authority to determine what is appealable.

1. *Bowen v. Carnes*, 343 S.W.3d 805, 810 (Tex. Crim.App.2011) (quoting *State ex rel. Young v. Sixth Judicial District Court of Appeals*, 236 S.W.3d 207, 210 (Tex.Crim.App.2007)).

2. *E.g., Garcia v. Dial*, 596 S.W.2d 524, 529 (Tex.Crim.App.1980) (writ of mandamus lies to compel entry of a judgment, but not generally to compel entry of a particular judgment).

Such a practice is fundamentally at odds with our form of government. Rather than circumvent the ordinary appellate process, we should instead insist that mandamus not lie merely to evaluate the correctness of court decisions which are not reviewable on appeal, no matter how plainly erroneous those ruling may seem. Since mandamus is not available to force a particular result in matters calling for the exercise of judgment or discretion anyway, the Court should not invoke absence of an appellate remedy to justify use of its original jurisdiction as a convenient vehicle for the judicial review of otherwise unappealable orders.

Although, in the instant cause, the Court pays lip service to these precepts, its behavior once again parts company with its principles.[3]

I fear that, once again today, the Court merely pays lip service.

## II.

Does the State have a clear right to have the trial court submit the jury instructions it seeks? Although we do not have the entire record of the trial testimony before us, it is apparently undisputed that Falk, the real party in interest, did not personally cause Canfield's death. Understandably, the State wants the trial court to authorize the jury to convict Falk as a party under Section 7.02(a)(2) of the Penal Code.[4] In denying mandamus relief, the court of appeals held that whether the evidence supported such an instruction constituted a manifestly "judicial determination[,]"[5] depending on the trial court's

understanding of the testimony and whether the jury could rationally infer that Falk, with the specific intent to promote or assist in the commission of the capital murder of Canfield, solicited, encouraged, directed, aided, or attempted to aid Martin in killing her.

The trial court was concerned about the testimony of a "Mr. Isaacs," as well as a "witness who was under the shed[.]"[6] Neither the court of appeals nor this Court has been graced with the trial testimony of these two mystery witnesses. What we do have is testimony from two other witnesses, two of the guards (other than Canfield) who were armed and mounted. These witnesses establish that, working in concert, Martin and Falk distracted one of these witnesses, Jeffcoat, and Martin wrested his pistol from him. Martin tossed the pistol to Falk, who then scrambled outside the perimeter fence. There, Falk and Canfield exchanged an undetermined number of pistol shots before Falk approached Canfield's horse. A struggle ensued for the rifle in Canfield's scabbard, which Canfield only relinquished when Falk jammed his pistol into her ribs. The testimony that we have varies with respect to how far Falk then removed himself before the truck that Martin had commandeered struck Canfield's horse.[7] But from the record excerpts that we have before us, it is clear that Falk was retreating.

On this state of the record, the trial judge might have deemed the evidence to be insufficient to justify a rational jury

3. *State ex rel. Healey v. McMeans*, 884 S.W.2d 772, 779 (Tex.Crim.App.1994) (Meyers, J., dissenting).

4. Tex. Penal Code § 7.02(a)(2).

5. *In re State of Texas ex rel. David Weeks*, 392 S.W.3d 280, 286–87 (Tex.App.-Waco 2012).

6. Majority opinion at 120–21.

7. Jeffcoat, the guard with the best vantage, testified that Falk was "probably twenty feet" away from Canfield by the time he noticed the truck approaching. The other guard who testified could not estimate the distance because Canfield's horse blocked his line of sight.

inference that, at the moment the truck struck Canfield's horse, Falk still harbored whatever willingness he may have earlier displayed to cause her death.[8] The record insofar as we have it establishes clearly enough that Falk intended to escape and to aid Martin's escape attempt as well. But there is no specific showing that he knew Martin had commandeered a truck,[9] much less that Martin would then use it to run into Canfield's horse. The trial court might conceivably have concluded that the record does not fairly support a jury verdict that Falk specifically intended to promote or assist a capital murder.[10] Such a conclusion would seem to me to be at the very least debatable. Like the court of appeals, I cannot say the trial court's judicial determination—that the only theory of party liability available to the State to establish Falk's complicity for capital murder was the conspiracy theory authorized under Section 7.02(b) of the Penal Code— was so manifestly off-base as to justify mandamus relief. I certainly would not

slam on the brakes in the middle of a capital murder trial—especially at the point at which the jury has heard all of the evidence and awaits only instruction from the trial court and argument of the parties before retiring to deliberate—in order to address the question.

## III.

The trial judge's proposed party instruction under Section 7.02(b) would require the State to prove that Falk should have anticipated that, in the course of carrying out the conspiracy to escape, Martin would commit the capital murder of Canfield in the particular manner in which he did— namely, by striking her horse with a truck. The court of appeals offered its "strong opinion" that this was an unjustified construction of the law, but held that the question is nevertheless one of "first impression" and therefore not "well-settled" law so as to authorize relief under the second prong of the standard for mandamus relief.[11] Today this Court disagrees,

8. The pistol that Falk jammed into Canfield's ribs was subsequently found on the ground close to Canfield's body. All of the rounds in the cylinder had been fired. From this it might be argued that Falk could not have killed Canfield with the pistol by the time he jammed it into her ribs, and that his apparent threat to do so if she did not relinquish the rifle was hollow. Still, once he secured the rifle, he could have used it to shoot Canfield, but he did not. From the record that we have, all we can reasonably conclude is that, once he obtained the rifle, Falk retreated.

9. Jeffcoat testified that the truck Martin stole belonged to "[t]he guy that works for the sign shop" on an adjacent property, and that it "is always parked in the same spot." The inference is that Martin and Falk would have noticed the truck there as they worked in the onion field and may have planned to steal it. But there is no evidence in the record before us to show that the key was in the truck or to suggest that Martin could have distracted Jeffcoat, grabbed his pistol, made his escape through the perimeter fence, got to the truck,

hot-wired it, and drove it into Canfield's horse in the minute-and-a-half to two minutes over which Jeffcoat estimated the entire incident transpired.

10. From the trial judge's bare comments on the record, Majority Opinion at 120–21, I cannot say whether this supposition accurately reflects his actual reasoning process. On direct appeal, however, we will typically uphold a trial court's ruling when it reaches the correct result for the wrong reason. *See, e.g.,* State v. Ross, 32 S.W.3d 853, 855–56 (Tex. Crim.App.2000) ("If the trial judge's decision is correct under any theory of law applicable to the case, the decision will be sustained."). I should think that this principle would apply in spades in the milieu of mandamus proceedings. We should be able to say that a trial court's judicial decision is not only unjustified, but *unjustifiable,* before we are willing to hold that he had a *ministerial* duty to decide otherwise.

11. *Weeks, supra,* 392 S.W.3d at 290 & n. 8.

citing two cases for the proposition that mandamus may sometimes be appropriate to resolve issues of first impression.[12] But in each of those cases we regarded the meaning of the governing statute, if not altogether plain from the statutory language, to be sufficiently "clear and undisputable" to entitle the State to the mandamus relief it sought.[13]

Here, the Court does not purport to rely on the "clear and indisputable" meaning of Section 7.03(b) itself to establish that the trial judge's proposed instruction is unauthorized. Instead, it relies upon "well-established evidentiary sufficiency principles" to conclude that the State has a "clear right" to the Section 7.02(b) jury instruction *sans* the trial judge's gloss.[14] But these "principles" do not derive from the language of the statute itself, and there is no case law directly on point. To reach its desired result, the Court must extrapolate from existing (and relatively new) case law—it must *extend* those "well-established evidentiary sufficiency principles"—to the particular question at hand to justify its conclusion.[15] I agree with the

court of appeals that applying even well-settled legal "principles" to novel fact scenarios is manifestly a judicial function, not subject to mandamus compulsion.

## IV.

Granting mandamus relief under these circumstances only serves to encourage prosecutors to seek what amounts to an interlocutory appeal whenever a trial court's ruling during the course of a trial displeases them. Interlocutory appeals are generally disfavored;[16] interlocutory appeals that allow the State to circumvent the legislative will with respect to what judicial rulings the State should be able to challenge *at all* on appeal are all the more objectionable.[17] And when the enterprise moreover necessitates the interlocutory generation of a transcript of large portions (but not all) of the court reporter's notes and due consideration of an incomplete record by, not one, but two higher courts, while a jury that has heard all of the evidence has been sent home to cool its heels—that is all the more reason to refuse

---

12. *State v. Patrick*, 86 S.W.3d 592 (Tex.Crim. App.2002); *State ex rel. Rosenthal v. Poe*, 98 S.W.3d 194 (Tex.Crim.App.2003).

13. *Poe, supra*, at 201–02; *Patrick, supra*, at 595.

14. Majority Opinion at 126.

15. Both the trial court and the State were operating under the presumption that the indictment alleged that Canfield's death was caused by a particular manner and means, namely, by striking the horse she was riding with a deadly weapon, to wit, a motor vehicle. Less than a year ago we held, in *Johnson v. State*, 364 S.W.3d 292 (Tex.Crim.App.2012), that a variance in the particular manner and means by which an appellant committed an aggravated assault did not cause the State's proof to be legally insufficient. Although *Johnson* did not involve a murder prosecution, the reasoning by which we arrived at our conclusion would most likely apply in the

context of a prosecution for capital murder. *See id.* at 296, 298 (observing that variances with respect to the manner and means by which a murder is accomplished do not implicate legal sufficiency). But we have not explicitly said so. Nor have we explicitly said in any case that what applies to determining the legal sufficiency of the primary allegation would apply equally to determining the legal sufficiency of the evidence to establish party liability under Section 7.02(b). It is therefore likely that both the trial judge and the State were operating under a presumption that will not be borne out by post-*Johnson* jurisprudence. But that is a question of law the answer to which has not, until today, been firmly resolved by either statute or case law.

16. *Ex parte Smith*, 178 S.W.3d 797, 801 & n. 13 (Tex.Crim.App.2005).

17. *McMeans, supra*, at 779 (Meyers, J., dissenting).

to exercise our discretionary authority even to entertain the application, much less grant mandamus relief.[18] I respectfully dissent.

18. George E. Dix & John M. Schmolesky, 43B TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCE- DURE § 61:3, at 930 (3rd ed.2011).