**Affirmed and Memorandum Opinion filed February 21, 2019.**



In The

# 𝔉𝔬𝔲𝔯𝔱𝔢𝔢𝔫𝔱𝔥 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## NO. 14-17-00315-CR

### JOHN ANTHONY VELA, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 209th District Court
Harris County, Texas
Trial Court Cause No. 1444432**

## M E M O R A N D U M   O P I N I O N

Appellant John Anthony Vela appeals his conviction for capital murder.[1] The State did not seek the death penalty, and appellant received an automatic sentence of life imprisonment. Appellant challenges his conviction in two issues, arguing: (1) the trial court included an instruction in the jury charge on the law of parties when no evidence of appellant's participation in the offense with another

---

[1] Tex. Penal Code § 19.03.

party exists; and (2) insufficient evidence supports his conviction. We conclude that sufficient evidence supported submission of the law-of-parties instruction because the evidence raised the issue of participation with an unknown individual. We further conclude appellant's conviction is supported by sufficient evidence and affirm the trial court's judgment.

## BACKGROUND

In the morning hours of September 27, 2002, a maintenance worker discovered the bodies of the complainants, Melissa Williams and Kevin Collins, in a bedroom of their trailer home in La Porte. Williams and Collins had been stabbed with a knife multiple times. Williams's two-year-old child, M.J., was found standing in her crib unharmed. Police investigated the deaths, but no charges were filed until fourteen years later, when appellant was arrested and indicted for capital murder. A jury convicted appellant as charged.

### *Appellant begins purchasing drugs from Williams and a dispute develops.*

In 2002, Williams and Collins were in their early twenties and living together in a trailer home in La Porte. Recently unemployed, Williams began selling crack cocaine to between five and seven people. She stored the drugs in the trailer, hidden in various places, and Collins occasionally helped Williams with the drug sales. Williams's close friend Elise Lunday visited often and testified that Williams liked her home neat and kept the trailer immaculate.

Approximately two months before the murders, Williams ran into appellant at a local convenience store. Williams knew appellant from school and through her friendship with two of his sisters. Appellant accompanied Williams from the convenience store to the trailer home to pick up Collins and Lunday. Williams, Collins, Lunday, and appellant then travelled to appellant's apartment, located

2

approximately a mile from the trailer park. While at appellant's apartment, the four smoked marijuana and watched a movie. Appellant played the movie using a DVD-VCR combination player, a novel electronic device at the time. Appellant commented that he had recently purchased the DVD-VCR combo for a lot of money.

Over the next two months, appellant purchased drugs from Williams ten to fifteen times. One night, a couple of weeks after the four went to appellant's apartment, Lunday was spending the night at the trailer with Williams and Collins. Appellant came by the trailer home around 5:00 a.m. banging on the doors and windows, asking for crack cocaine. Williams became angry and appellant left. The following day, Williams went over to appellant's apartment and returned with a DVD-VCR combo. The DVD-VCR combo Williams returned with appeared to be the same DVD-VCR combo Lunday had seen in appellant's apartment. In Lunday's presence, Williams scratched off the serial numbers and carved an "M" in the back of it, and then took it to another friend's trailer a few doors down. Sometime later, Williams brought the DVD-VCR combo back to her own trailer and placed it next to the TV in the master bedroom she shared with Collins. Collins hooked up the DVD-VCR combo to the TV.

Although appellant initially told his friends that the DVD-VCR combo was stolen, appellant eventually admitted that he traded the DVD-VCR combo to Williams for $40 worth of drugs. Appellant asked Williams to give him more for the DVD-VCR combo, but she refused and would not return it to appellant. Because of his dispute with Williams over the DVD-VCR player and because he owed Williams money, appellant could no longer buy drugs from Williams. Appellant asked a friend, Eric Baswell, to get drugs from Williams so that appellant could then in turn sell them to someone else for a profit. Baswell later

learned that appellant did not intend to sell the drugs to someone else, but instead wanted the drugs for himself.

***The day before and morning of the murders.***

On September 26, 2002, the day before the murders, Williams mowed the yard and spent the day cleaning. Lunday was at the trailer with Williams and noticed that Williams had used a set of sheets and comforter that Lunday had recently given her on the bed in Williams's and Collins's bedroom. When Lunday entered the bedroom, she noticed that it smelled good and was very clean. She also noticed the DVD-VCR combo player in the bedroom.[2] That same day, Lunday and Williams had rented two movies from Blockbuster—the VHS movie *Frailty* and a DVD that was a comedy.[3] Lunday then went back to her apartment, but around 7:00 p.m., Williams picked Lunday up from her apartment and they returned to the trailer to cook dinner.

Several of Williams's and Collins's friends came and went that night, starting around 8:00 or 9:00 p.m. The friends mainly played video games on a Playstation set up in the living room of the trailer and smoked marijuana. The air conditioner in the trailer was not working that night and the trailer became warm. The group ran fans and cracked some of the windows. Lunday was not feeling well and by 10:00 p.m. could no longer tolerate the heat. Williams called a friend to come over and give Lunday a ride home.[4] Around midnight, Williams went over to Lunday's apartment to bring her NyQuil and orange juice. Williams dropped off the items and made plans with Lunday for the next morning.

---

[2] Lunday conceded on cross-examination that when she spoke to the police in October 2002, she stated she did not recall seeing the DVD-VCR player. She explained that she was in the process of burying her friends and terrified at that time.

[3] Evidence revealed a DVD movie case at the scene for the movie *Big Fat Liar*.

[4] Williams's car was in the repair shop.

4

That same evening, appellant was at his friend Roger Bray's townhouse. Bray lived near appellant and appellant would go over to Bray's house "pretty much every day after work." The two, along with their friend Baswell, would often hang out and smoke marijuana after appellant got off work doing manual labor at Zachary Construction. That evening, Baswell and Bray were playing on a Playstation when appellant came over. Appellant asked Baswell to go over to Williams's and Collins's trailer to get drugs for appellant to sell to a third party. Recalling the last time appellant asked them to do so when the drugs were actually for appellant and not a third party, Baswell refused. Appellant then asked Baswell to page their friend Zachary Brooks to ask Brooks to bring drugs over, but Baswell had already done so and refused to page him again. Appellant left Bray's townhome around 8:00 or 9:00 p.m. agitated that Baswell would not go to Williams's trailer or page Brooks to obtain drugs. Appellant did not return to Bray's that night.

Later that evening, appellant asked James Stone for a ride to Williams's and Collins's trailer park. Stone lived in the same apartment complex as appellant and was the son of the complex's manager. Stone had provided a "rock" of crack cocaine to appellant previously and testified that appellant owed him money for that and owed rent. According to Stone, appellant told him that appellant planned to get a "front"[5] of drugs from Collins. Stone dropped appellant off at the trailer park, one lot over from Williams's and Collins's trailer, sometime near "closing time" for a bar that Stone was heading to.

Around 2:30 a.m., on September 27, 2002, Melvin Anderson and Thomas Durst, who had been part of the group hanging out at Williams's and Collins's

---

[5] Stone defined a front as "a lump sum of drugs to make the money you need and cover what you owe the man you got it from."

5

trailer that night, left to go home. At the time they left the trailer, seven people remained: Williams, Collins, M.J., and four friends. Anderson saw nothing unusual that night and he did not see appellant come over.

***Discovery of Williams's and Collins's bodies.***

At approximately 9:30 a.m., trailer park maintenance worker Jesse Lewis went to Williams's and Collins's trailer to repair the air conditioner. Lewis received no answer to his knock on the door, but discovered the front door open, the trailer quiet, and drawers pulled out in the kitchen. Lewis continued to the back of the trailer and the master bedroom where the breaker box was located. As he stood at the threshold, he saw Williams's and Collins's bodies. Collins was on his back on the bed and Williams was lying in a fetal position on the floor. Lewis did not initially understand what he was seeing but when he noticed he was standing in blood, he left the trailer and called his wife, who called the police.

The responding officers entered the trailer and went to the bedroom, where they observed blood everywhere, open cuts on the two bodies, and no sign of life. The officers removed M.J. from her crib and secured the scene to wait for investigators. Detective Danny Jones from the La Porte Police Department and Texas Ranger Freeman Martin were assigned to investigate the crime. Jones observed an open window next to the door along with several electronics, including a television, video game station, and VCR player, in the living room that were untouched. In contrast, the master bedroom where the bodies were found was in disarray, with the television knocked on the floor, dresser drawers opened with their contents dumped out, and paneling from a closet removed from the wall. On the mattress where Collins's body lay, the investigators found bloody footprints and a remote control for a DVD-VCR player covered in blood.

Williams was found nude in a fetal position on the floor next to the bed. She

6

sustained forty-seven stab wounds, including many to her back and multiple defensive wounds to her hands, forearms, and wrists. Her death was caused by loss of blood from the multiple stab wounds. Collins was found nude laying on his back on top of the bed. He sustained sixty-seven stab wounds, thirty-one of which were defensive wounds. Collins suffered significant wounds to his upper chest area and neck, including the severing of his jugular vein. He also suffered a wound to his left ankle with significant blood loss, which could have been a defensive wound received from kicking his assailant. After processing the scene, personnel from the trailer park boarded up the trailer with instructions from the police not to let in unauthorized persons.

That evening, appellant did not go to Bray's townhome as he typically did after work to hang out and smoke marijuana. Bray found it unusual, especially given what happened to Williams and Collins. Two days later, appellant went over to Bray's townhome. By that time, appellant's name had been mentioned as being involved with the murders. When Bray asked appellant if he had anything to worry about, appellant responded "hell no." According to Bray, the only thing people had heard at that point was that someone broke in, stabbed the victims, and it was bad. Appellant asked "[s]o what happened, somebody just walked in there and stabbed them gaucho, like gaucho, like a bunch?"[6] A few days later Bray observed appellant moving things out of his apartment, and appellant told Bray he was going to work for Zachary Construction in China because "people were trying to pin this on him." Bray acknowledged that appellant had moved back and forth between his parents' home before.

### The initial investigation.

A few days after the discovery of Williams's and Collins's bodies, Detective

---

[6] Bray explained that gaucho is "a Mexican phrase for a bunch of times."

7

Jones returned to the trailer. He had learned of the DVD-VCR combo from Lunday and of the fact that she found appellant suspicious. Detective Jones did not find the DVD-VCR combo in the trailer, but he did locate in the master bedroom an empty DVD case for the movie *Big Fat Liar* and an empty VHS case for the movie *Frailty*.

On October 7, 2002, approximately ten days after the murders, Detective Jones and Ranger Martin went to speak with appellant at his apartment. They observed appellant loading his furniture and belongings into the back of a black Ford Explorer. Many of the belongings were in black plastic trash bags. After obtaining appellant's consent, Jones and Martin searched the vehicle, but did not search the contents of all of the black trash bags and found no evidence they felt was of value. That same evening, appellant went to the police station and Ranger Martin photographed several scratches on appellant's left hand, left arm, and back, as well as a bruise on his right leg. They also searched appellant's parents' home that evening. Detective Jones stated they did not search thoroughly because of the late hour, and although they inspected appellant's shoes and clothes at the house, they found nothing of value to their investigation.

Shortly after the murders, police also investigated James Stone, the acquaintance who gave appellant a ride to the trailer. Stone was a known drug addict and had previously bought crack cocaine from Collins and Williams. Police interviewed Stone at his apartment, where they found cocaine and a kitchen knife. Stone was on probation at the time and was arrested and sent to prison for the cocaine possession. The knife recovered from Stone's apartment was stored with his drug case and was not processed for blood. The knife was ultimately destroyed without being tested, which Detective Jones conceded was a mistake. In his initial and several subsequent interviews with the police, Stone did not inform them of

the ride he gave appellant to the trailer park in the early morning hours before the murders.

In February 2003, Detective Jones and Ranger Martin decided to go back to appellant's parents' home and conduct another search. At that time, they located a DVD-VCR combo player in a black plastic trash bag at the bottom of a closet. The detective found a DVD-VCR combo player, which contained the DVD movie *Big Fat Liar*, and the VHS movie *Frailty*. The player also had what appeared to be blood stains on the back where the plugs were located. Jones and Martin also located a single lock-bladed knife with a wood handle in the same bedroom. Both the knife and DVD-VCR combo were analyzed. No blood was found on the knife, but apparent blood was found on the DVD-VCR combo. DNA analysis of the blood revealed profiles consistent with Williams's DNA on the underside panel and a front plug, and a mixture of Williams's and Collins's DNA on a white plug on the front and back panel area. The DVD-VCR combo also had the letter "M" carved on the back. The search of appellant's parents' home did not reveal a murder weapon, any footwear consistent with the bloody shoe prints found at the scene, or any drugs.

The investigators collected fingernail clippings and scrapings from both Williams and Collins. Analysis of a portion of the fingernail scrapings from Williams and Collins was also analyzed, which found only profiles consistent with Williams's and Collins's DNA. The untested portions of the fingernails and scrapings were repackaged and stored. Appellant was excluded from samples taken from pillowcases and drawers at the scene. The case was presented to the then-district attorney in 2002 and charges were rejected. The case went cold.

### *A new district attorney accepts charges and new testing is performed.*

In 2009, La Porte's new police chief asked detectives about open cases.

Detective Jones identified Williams's and Collins's murder and began re-investigating the case. By 2014, he re-interviewed original witnesses and suspects and submitted ten items of evidence for re-testing. Although no new DNA or additional evidence was found in 2014, Detective Jones presented the case to different prosecutors in the district attorney's office and charges were accepted. Analysts with the Department of Public Safety crime lab then re-tested the fingernail clippings and scrapings from Williams using newer and more sensitive technology. When the testing was performed in October 2016, the test revealed that one of Williams's fingernail clippings had a substance under it consistent with a mixture of DNA from three individuals: Williams, appellant, and an unknown individual. The forensic scientist that performed the testing explained that the likelihood ratio showed it was 186,000 times more likely that the DNA profile came from Williams, appellant, and an unknown individual, than if the DNA came from Williams and two unknown individuals. Investigators also spoke with Stone again regarding his initial statements to police. Although he initially denied remembering, claiming he was scared he would be implicated in the murders, Stone told investigators that he did in fact recall giving appellant a ride to the trailer park in the early morning hours before the murders.[7] Stone was excluded from the mixture found under Williams's fingernail.

The case proceeded to trial in 2017. Over appellant's objection, the trial court included in the abstract and application portions of the jury charge instructions related to criminally responsible conduct and the law of parties. The jury found appellant guilty, and this appeal followed.

---

[7] Stone also admitted at trial that he lied to police about being in a fight at a bar on the night of the murders.

ANALYSIS

Appellant raises two issues on appeal. In his first issue, appellant argues the trial court committed reversible error by including the law-of-parties instructions in the charge because there was no evidence that appellant participated as a party with anyone else in committing the offense. In his second issue, appellant argues that the evidence supporting his guilt for the charged offense is legally insufficient. Because the sufficiency challenge would afford appellant the greatest relief, we address that issue first. *See Lucas v. State*, 245 S.W.3d 611, 612 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). We then turn to appellant's claim of charge error.

## I. Sufficient evidence supports the jury's verdict.

The State has the burden to prove, beyond a reasonable doubt, every element of the charged offense. *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018). In reviewing the sufficiency of the evidence, a reviewing court must determine whether "'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Spiers v. State*, 543 S.W.3d 890, 896 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd). Under the sufficiency standard, "'*all of the evidence* is to be considered in the light most favorable to the prosecution.'" *Washington v. State*, __ S.W.3d __, 2018 WL 6684294, at *3 (Tex. App.—Houston [14th Dist.] 2018, no pet. h.) (quoting *Jackson*, 443 U.S. at 319). The jury is the "sole judge of the credibility and weight to be attached to witness testimony." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016). The jury must resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Nisbett*, 552 S.W.3d at 262. "An appellate court cannot act as a

thirteenth juror and make its own assessment of the evidence. A court's role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Id.*

Circumstantial evidence is as probative as direct evidence, and circumstantial evidence alone can be sufficient. *Id.* "Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction." *Id.* Courts must consider the evidence cumulatively, thus we cannot use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Id.*

In proving each element of the charged offense beyond a reasonable doubt, the State is not required to exclude every conceivable alternative to a defendant's guilt. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). "Focusing on other reasonable explanations for evidence improperly applies the abrogated reasonable-alternative-hypothesis construct." *Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018). The jury has the exclusive role to resolve inconsistencies in the evidence, "including deciding whether the State's theory of the case is more credible than another reasonable, exculpating hypothesis raised by the evidence." *Ramsey v. State*, 473 S.W.3d 805, 808 n.3 (Tex. Crim. App. 2015).

In this case, the State had to prove beyond a reasonable doubt that appellant intentionally and knowingly caused the deaths of Williams and Collins in the same transaction by stabbing them with a knife. Tex. Penal Code § 19.03(a)(7)(A). There is no dispute that Williams and Collins died from stab wounds from a knife or that they were murdered during the same transaction. Appellant's challenge to the evidence is based on identity. Appellant argues the State failed to prove he was present at or near the time of the murders and had the opportunity to commit the offense. Identity may be established by direct evidence, circumstantial evidence,

12

or reasonable inferences from the evidence. *Ingerson*, 559 S.W.3d at 509. We conclude that, after reviewing the evidence in the light most favorable to the verdict, the evidence is sufficient to support the jury's verdict.

The State produced several pieces of circumstantial evidence that appellant committed the murders. Investigators retained and re-tested the fingernail clippings and scrapings from Williams. Appellant could not be excluded from the mixture of DNA recovered from Williams's fingernail. The likelihood of it being appellant's DNA was 186,000 times more likely than it being the DNA of another unknown individual. Appellant argues that the DNA evidence does not place him at the scene at or near the time of the murders, only that he was in the trailer at some point. But there was other evidence from which a rational fact finder could infer that appellant was at the scene at or near the time of the murders. *See Finley v. State*, 529 S.W.3d 198, 204 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (while mere presence of defendant's blood in the sink was evidence that defendant was at the house at some point, mixture of defendant's blood and victim's blood in sink supported inference defendant was at the scene and attempted to eliminate evidence).

Lunday testified that Williams had been cleaning all day and made dinner in the hours before the murders. The DNA analyst explained that DNA evidence may be washed off if a person washes their hands and that DNA evidence does not crawl or travel on its own. No witness reported seeing appellant at the trailer after the cleaning. Investigators documented scratches on appellant's arm and back and bruising on his leg ten days after the murders. The DNA analyst testified that it would not be unusual to find the DNA of a person who was scratched under a victim's fingernail. Another analyst testified that a victim can receive a defensive wound in the ankle area when kicking his attacker. Collins had a significant

13

wound on his left ankle and appellant had bruising on the inside of his leg consistent with someone kicking him. A reasonable inference from the evidence is that appellant's DNA lodged under Williams's fingernail during the course of the murders and is probative of appellant's guilt. *See Matthews v. State*, 513 S.W.3d 45, 55 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (finding sufficient evidence defendant committed murder based on, among other things, evidence that defendant's DNA was recovered from victim's fingernail clippings); *see also Webster v. State*, No. 01-16-00163-CR, 2017 WL 2806786, at *6 (Tex. App.— Houston [1st Dist.] June 29, 2017, no pet.) (mem. op., not designated for publication) (location of defendant's DNA was indicative of guilt because it indicated victim attempted to defend herself from him).[8]

Appellant challenges the DNA evidence and the evidence of scratches and bruising based on the weight and credibility of the evidence. The DNA analyst discussed the fact that DNA can remain on a surface for a long time and can be transferred by mere contact with an object. Appellant argues the DNA could have been transferred to Williams's fingernail from simple contact sometime other than the murders, and that the likelihood of the DNA belonging to appellant was small given the ratio of 186,000 to 7 billion people on earth. Appellant further argues that the scratches and bruising were not substantial and could have been sustained in the course of his employment as a manual laborer for Zachary Construction. Appellant has offered alternative hypotheses for the evidence or attacked the weight to be given the DNA evidence, but the jury is the exclusive judge of the weight and credibility of the evidence and witnesses. *Ingerson*, 559 S.W.3d at 509 ("Focusing on other reasonable explanations for evidence improperly applies the

---

[8] We acknowledge that *Webster*, as an unpublished decision, has no precedential value but the similar facts make the case instructive. *See Roberson v. State*, 420 S.W.3d 832, 837 (Tex. Crim. App. 2013).

abrogated reasonable-alternative-hypothesis construct."); *Ramsey*, 473 S.W.3d at 809 ("The trier of fact is the exclusive judge of the credibility and weight of the evidence and is permitted to draw any reasonable inference from the evidence so long as it is supported by the record."); *Washington*, 2018 WL 6684294, at *7.

The State also presented evidence that the DVD-VCR combo with an "M" scratched on the back was in appellant's possession after the murders. Investigators located the DVD-VCR combo player in a trash bag at the bottom of a closet in appellant's parents' home where he was staying. The DVD-VCR combo held the two movies that had been rented by Lunday and Williams the day before the murders, the empty cases for which remained at the murder scene. The remote control from the DVD-VCR combo was found covered in blood at the murder scene. Lunday testified that she saw the DVD-VCR combo player in Williams's and Collins's bedroom on the day before the murders but it was not located at the scene after the bodies were discovered. The DVD-VCR combo contained several spots of apparent blood that contained DNA consistent with Williams and Collins. A rational fact-finder could conclude from this evidence that the DVD-VCR combo was at the scene at or near the time of the murder, and then later found in appellant's possession, supporting an inference of appellant's guilt. *See Dawkins v. State*, 495 S.W.3d 890, 896 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (holding sufficient evidence existed to support murder conviction based on, among other things, defendant's possession of car, television, and DVD player from complainant's apartment).[9]

---

[9] Appellant states "[i]t is very possible that the combination player was returned to the Appellant prior to or after the murders by either of the Complainants." Of course, the complainants could not have returned the combination player to appellant *after* the murders because they were dead. Other evidence supports an inference that the combination player was not returned to appellant before the murders either. As discussed, the player recovered from appellant's parents' closet contained the two movies Williams had rented shortly before the

15

The State presented evidence of appellant's motive and opportunity to commit the charged offense. While motive and opportunity are not elements of the offense and not sufficient to prove identity, they are "circumstances indicative of guilt." *Merritt*, 368 S.W.3d at 526; *see also Ingerson*, 559 S.W.3d at 510. Evidence showed that appellant was upset with Williams regarding the DVD-VCR combo trade and that he wanted a front for drugs from Collins the evening of the murders. Baswell testified that appellant believed he did not receive a sufficient amount of drugs in exchange for the DVD-VCR combo and was upset that Williams would not return it or give him more drugs. Baswell and Bray testified that on the evening before the murders appellant specifically asked them to get a front of drugs from Collins. Baswell and Bray would not do so and appellant left Bray's townhome that evening aggravated or agitated that they would not help him get drugs. A rational fact-finder could believe that appellant was angry that Williams did not give him more for the DVD-VCR combo, agitated that he could not get more drugs that evening, and wanted to obtain drugs from Collins. The state of the scene is consistent with someone searching for drugs.

Motive to kill based on anger or a desire to obtain drugs are circumstances indicative of guilt. *Ingerson*, 559 S.W.3d at 510 (anger is a motive for murder indicating guilt); *cf. Gibbs v. State*, 555 S.W.3d 718, 731 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (evidence of defendant's prior drug transactions and knowledge of where drugs kept in apartment was relevant to motive and made defendant's identity as shooter more probable). Appellant asked Stone for a ride

---

murders, the empty cases for those two movies and the remote control covered in blood remained at the trailer, and the player itself contained spots of blood consistent with William's and Collins's DNA. The jury reasonably could have inferred that appellant wrongfully obtained the combination player at or near the time of the murders. *See Washington*, 2018 WL 6684294, at *4 (jury had evidence to reasonably infer injuries occurred morning complainant died even though other evidence indicated some injuries could have been received earlier).

16

that night and Stone dropped him off one lot over from the trailer. Appellant lived within walking distance of the trailer. A rational fact-finder could conclude from the evidence that appellant had both motive and opportunity to commit the charged offense.

Finally, the State presented evidence that appellant acted differently in the days following the murders. "A defendant's conduct after the commission of a crime which indicates a 'consciousness of guilt' is admissible to prove that he committed the offense." *Matthews*, 513 S.W.3d at 54 (quoting *Ross v. State*, 154 S.W.3d 804, 812 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd)). Unlike almost every other day, appellant did not go to Bray's house to hang out the day Williams's and Collins's bodies were found. Bray found that unusual, especially given that many of their friends were talking about what happened. When Bray did see appellant a few days later, appellant told him he was going to China to work for Zachary Construction because the police were trying to pin the murders on him. Appellant used the word "gaucho" in asking about the murders, even though at that time it was not well-known that Williams and Collins had been stabbed a significant number of times. A defendant's unusual conduct and statements after a murder are circumstances indicating guilt. *See Washington*, 2018 WL 6684294, at *5.

While no single piece of evidence may directly link appellant to Williams's and Collins's murders, the cumulative effect of the evidence and the reasonable inferences that can be drawn therefrom, viewed in the light most favorable to the jury's verdict, supports the finding of appellant's guilt. *See Ingerson*, 559 S.W.3d at 511. We overrule appellant's second issue.

## II. The trial court did not err in instructing the jury on the law of parties.

In his first issue, appellant argues the trial court erred by submitting jury

instructions allowing a finding of guilt based on the law of parties. In reviewing claims of charge error we first determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005) (en banc). If error exists, we then analyze the error for harm. *Id.* We conclude the trial court did not err in submitting the instructions but, even assuming error, there was no harm from their inclusion in the charge.

A trial court is required to instruct the jury on the law of parties if party liability can legally apply to the offense at issue and is supported by the evidence. *In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013). The State does not have to prove it is correct regarding the defendant's participation as a party; instead, the State must only show that the evidence raises the issue to be entitled to its submission. *Id.* at 125. Under Section 7.02(a) of the Texas Penal Code, a person is criminally responsible for the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." Tex. Penal Code § 7.02(a)(2); *Weeks*, 391 S.W.3d at 124. Thus, to be entitled to an instruction of liability under a law-of-parties theory, the State had to present evidence that appellant acted with intent to promote or assist the commission of the offense by soliciting, encouraging, aiding, or attempting to aid in the commission of the murders. *See Weeks*, 391 S.W.3d at 124.

Appellant argues the trial court erred in submitting the law of parties because "[t]here was no State's evidence to support the theory that the Appellant acted with another." We disagree. The State presented evidence of the presence of DNA from an unknown individual under Williams's fingernail. The State also presented evidence that appellant wanted to obtain drugs from Collins that evening, and that he asked others to help him obtain drugs from Collins. Police found the

trailer in disarray, with contents of drawers pulled out and paneling pulled off the wall as if someone were looking for drugs, and a DVD-VCR combo player that appellant wanted was missing. After the murders, police located the VCR-DVD combo in appellant's possession. This evidence supports an inference, for the trier of fact to determine, that appellant was at the trailer with another person during the murders and either aided that person or solicited that person to help in the commission of the charged offense. *See Weeks*, 391 S.W.3d at 125 (evidence that defendant disarmed guard supported a conclusion that defendant aided another in committing capital murder; weight and credibility of the evidence of participation was for jury to decide).

Even assuming for the sake of argument that the evidence did not sufficiently raise the issue of appellant's participation as a party, we conclude there was no harm in the submission of the instructions. If the evidence "clearly supports a defendant's guilt as a principal actor, any error of the trial court in charging on the law of parties is harmless." *Ladd v. State*, 3 S.W.3d 547, 564-65 (Tex. Crim. App. 1999); *Spiers*, 543 S.W.3d at 898. This is because the jury "almost certainly" would not rely on the law-of-parties instruction to arrive at its verdict and would instead base its verdict on the evidence tending to show the appellant's guilt as a principal actor. *Ladd*, 3 S.W.3d at 565.

As discussed in our disposition of appellant's second issue, the evidence sufficiently supported appellant's identity as the principal actor in the murders. The State did not focus on or even mention the law-of-parties instruction in its closing argument, but rather focused on the evidence of appellant as the principal actor for the offense. Under these circumstances, there is no actual harm in the submission of the instruction. *Spiers*, 543 S.W.3d at 899; *see also Washington*, 2018 WL 6684294, at *14.

We overrule appellant's first issue.

## CONCLUSION

Having overruled both of appellant's issues, we affirm the trial court's judgment.

/s/    Jerry Zimmerer
Justice

Panel consists of Justices Jewell, Zimmerer, and Spain.

Do Not Publish — TEX. R. APP. P. 47.2(b).