

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NOS. AP-76,998 & AP-76,999

**In re PATRICK McCANN et al.**

## ON PETITIONS FOR WRITS OF MANDAMUS AND PROHIBITION AGAINST THE HONORABLE BRADY ELLIOT IN CAUSE NO. 10-DCR-54,233 IN THE 268TH DISTRICT COURT OF FORT BEND COUNTY

**PRICE, J., filed a dissenting opinion.**

## DISSENTING OPINION

Today the Court holds that, as between a lawyer and his client, the client owns the legal file that is in his lawyer's possession; that the client may dictate the disposition of that file; and that the client's dictates override the express order of a sitting judge. I wholly agree with the Court that "[t]he client's file belongs to the client."[1] But I disagree that this holding suffices to dispose of the mandamus proceeding before us. In my view, the Court asks the

---

[1] Majority Opinion at 6.

wrong question. The right question—the answer to which will properly dispose of the case before us—is whether, *given that* the file "belongs to the client," the convicting court presiding over this capital habeas corpus proceeding lacks all authority to order a disposition of that client's file that is at odds with the client's wishes. In my view, there is no clear answer to that question to be derived from any state precedent.

The Court effectively disposes of the question of the convicting court's authority by summarily declaring that Judge Elliott "did not have the authority (inherent or otherwise) to order McCann to violate his fiduciary duty to Turner[.]"[2] The only precedent the Court is able to muster in support of this declaration, however, simply establishes that a trial court's authority extends only to the issuance of "lawful" orders.[3] But, of course, the very question that the Court effectively begs is whether the convicting court's order compelling McCann to turn over his client's file against his client's wishes was, indeed, "lawful." If the Court must take this occasion to say what the law is for the first time, I fail to understand how it can be said that the law up until now was so "clear" that McCann is entitled to mandamus relief from the convicting court's contempt order. For that reason, I believe that mandamus relief should not lie.

---

[2] *Id*. at 16-17.

[3] *Id*. at 17 n.22.

**McCann's Dilemma: "A Lawyer Shall Not . . . Reveal Confidential Information"[4]**

An attorney's duty to maintain his client's confidences arises from his ethical obligations as a practitioner of the profession of lawyering.[5]  Both McCann and Rytting are attempting to satisfy what they perceive to be their respective ethical duties, but face the vexing dilemma that those duties cannot simultaneously be satisfied.  McCann, for his part, feels that he is bound by his ethical duty to maintain client confidences not to divulge confidential information over the wishes of his client.  Rytting feels that he is bound by his ethical duty of effective representation to seek trial counsel's files—whether they contain confidential information or not—and examine them for purposes of preparing an application for writ of habeas corpus.  Both lawyers, realizing the ethical quandary they are in, have laid their concerns at the feet of the convicting court and asked for a ruling so that one or the other of them may be absolved of any ethical wrongdoing.  What the Court essentially declares today is that the law unequivocally binds Judge Elliott to resolve this ethical quandary in McCann's favor.  I disagree.

The bulk of the Court's analysis is devoted to answering the following question: "To

---

[4]

*See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.05(b)(1) ("[A] lawyer shall not knowingly . . . [r]eveal confidential information of a client or former client to . . . a person that the client has instructed is not to receive the information[.]").

[5]

*See* TEX. DISCIPLINARY RULES PROF'L CONDUCT preamble ¶ 1 ("A lawyer is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice . . . . A consequent obligation of lawyers is to maintain the highest standards of ethical conduct.").

whom does a client's file belong?"  The Court relies, *inter alia*, on the Texas Supreme

Court's opinion in *In re George* to conclude that a client "owns the contents of his or her

file."[6]  I do not disagree with this conclusion.  But *George* itself recognizes that, a client's

ownership of his file notwithstanding, a "compelling reason" may justify "depriv[ing] a client

of his or her property."[7]  Indeed, in *George*, the Texas Supreme Court did not question the

trial court's ultimate authority to order disclosure, but rather sought to describe the

circumstances when, and the extent to which, it would be appropriate to *exercise* that

authority.[8]  Thus, simply to say that the file belongs to Turner, and that Turner, if he is

competent,[9] may do what he wishes with the file, does not answer the *determinative* question

in this case, which is: *Given that* the client owns the contents of his case file, does a

convicting court lack all authority to issue an order disposing of the file in a way that

conflicts with the client's expressed wishes? This question is anything but well-settled.

---

[6]

 *Id.* at 6-7 & n.8 (citing *In re George*, 28 S.W.3d 511, 516 (Tex. 2000)).

[7]

 *George*, 28 S.W.3d at 516.

[8]

 *Id*. at 515-16 ("Once they determine that a restriction [on disclosure] is necessary because an attorney has been disqualified for a prior, substantially related representation, some courts do not inquire into the work product itself.  They automatically forbid any work product from being transferred [over the client's wishes] to the successor attorney . . . This approach may be appropriate for cases in which the entire suit is based on improperly revealed confidential information . . . But we believe that it is inappropriate for a general rule.").

[9]

 My concerns about the Court's conclusion are not dependent upon, nor do they stem from, any issues relating to Turner's present competency.  To the contrary, *irrespective of* Turner's mental capacity to make decisions affecting his post-conviction pursuit of relief, my concerns relate only to what I perceive to be the unsettled state of the law.

To the extent that the Court relies on ethical considerations to reach its ultimate conclusion, there is good reason to think that the answer to this question is: No, the authority of trial judges is *not* limited in this way. Professors Goode, Wellborn, and Sharlot have concluded that "[t]he rules of professional conduct do not . . . provide an independent basis for refusing to answer questions during the course of a . . . criminal proceeding."[10] That treatise also notes that "the attorney-client privilege empowers a client to block the *compelled* disclosure of confidential attorney-client communications . . . [while] the ethical obligation enjoins the lawyer from *voluntarily* revealing confidential information obtained while representing the client."[11] The distinction, in that discussion, between "compelled" and "voluntary" disclosures serves to highlight an important aspect of this case: McCann is not citing the Rules of Professional Conduct for the proposition that he is ethically prohibited

---

[10] Steven Goode, Olin Guy Wellborn III, & M. Michael Sharlot, 1 TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE § 503.3, at 411 (3d ed. 2002).

[11] *Id.* (emphasis added). The explanation in a previous edition was even more to-the-point: "Protection against *non-compelled* disclosure of a client's confidential communications to his attorney comes from the Texas Disciplinary Rules of Professional Conduct." Steven Goode, Olin Guy Wellborn III, & M. Michael Sharlot, 1 TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 503.2, at 327 (2d ed. 1993) (emphasis added). *See also* Robert A. Pikowsky, *Privilege and Confidentiality of Attorney-Client Communication Via E-mail*, 51 BAYLOR L. REV. 483, 490-91 (1999) ("Of course, a professional who is called to testify in judicial proceedings cannot lawfully refuse to do so based exclusively on a duty of confidentiality in the absence of any recognized privilege. Unless a privilege exists as well, the court can properly require the professional's testimony."); Mitchell M. Simon, *Discreet Disclosures: Should Lawyers Who Disclose Confidential Information to Protect Third Parties Be Compelled to Testify Against Their Clients?*, 49 S. TEX. L. REV. 307, 315 (2007) ("The key difference between confidentiality, which governs a lawyer's *voluntary* actions, and privilege is that *privilege* trumps a court's authority to compel testimony.") (emphasis added).

from *voluntarily* turning over Turner's files. Were he to make such an argument, I would be inclined to agree with him. Rather, McCann is citing to the Rules of Professional Conduct for the proposition that the trial judge *has no authority to compel* McCann to turn the files over to Rytting, nor even to order him to make a copy and turn that over. And this is where I think McCann's (and, by extension, the Court's) argument ultimately falters.

The Texas Disciplinary Rules of Professional Conduct *explicitly* envision that there will be occasions when a lawyer will face conflicting obligations from, on the one hand, a court order, and, on the other, the Rules themselves. Rule 1.05(c)(4), for instance, states that "[a] lawyer may reveal confidential information . . . [w]hen the lawyer has reason to believe it is necessary to do so in order to comply with a *court order*[.]"[12] We have not, either today or at any other time that I am aware of, explained what effect, if any, this provision has on the authority of a trial judge to resolve an ethical Catch-22 such as the one presented in this case.[13] True enough, the Rule states that a lawyer "may reveal," not that he "must reveal." But this simply means that one who voluntarily disobeys a court order to turn over confidential material does not violate *the Disciplinary Rules of Professional Conduct*—it does not mean that he does not violate the court order, that the order is of no effect, or that

---

[12] TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.05(c)(4) (emphasis added).

[13] *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.05 cmt. 22 ("[A] lawyer may be obligated by other provisions of statutes or other law to give information about a client. *Whether another provision of law supersedes Rule 1.05 is a matter of interpretation beyond the scope of these Rules*.") (emphasis added).

the Rules altogether strip the court of the authority to issue that order. This conclusion is especially apparent when Rule 1.05 is considered in light of other provisions of the Texas Disciplinary Rules of Professional Conduct that make clear that the Rules govern *the profession of lawyering*—not the authority of trial judges—and *by their terms* purport to extend no further.[14]

Moreover, to the extent that the Court relies on property-law considerations in reaching its ultimate conclusion, again there is reason to think that the answer to (what I have called) the determinative question in this case would also cut against a grant of mandamus relief to McCann—that is, that property law *by itself* does not limit the authority of trial judges in the way envisaged by the Court. In coming to the conclusion that McCann's "burden based on the binding precedent . . . under *Burnett*" is sufficiently weighty to render Judge Elliott's order unenforceable, the Court purports only to reaffirm our holding in Burnett that "a client owns the contents of his or her file."[15] From there, the Court (correctly)

---

[14]

*See, e.g.*, TEX. DISCIPLINARY RULES PROF'L CONDUCT preamble ¶¶ 11-16 ("The[se] rules presuppose a larger legal context . . . [which] includes court rules and statutes relating to matters of . . . laws defining specific obligations of lawyers and substantive and procedural law in general. [* * *] These rules make no attempt to prescribe either disciplinary procedures or penalties for violation of a rule. [* * *] Violation of a rule . . . does [not] create any presumption that a legal duty to a client has been breached . . . The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of disciplinary authority, *does not imply that an antagonist in a collateral proceeding . . . has standing to seek enforcement of the rule.* Accordingly, *nothing in the rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.* [* * *] Moreover, these rules are not intended to govern or affect judicial application of either the attorney-client or work product privilege.") (emphasis added).

[15]

Majority Opinion at 6-7 & n.7, 14-15 & n.19.

recognizes that the assertion of the attorney-client privilege is not implicated in this case and then (incorrectly) surmises that the second holding of *Burnett* can be disregarded.

To the contrary, I find it significant that *Burnett*'s first holding—according to the Court, that the client owns the contents of his or her file—did not dispose of the relevant issue in that case. Indeed, the fact that the *Burnett* Court saw the need to discuss the law of privilege *after* determining ownership of the file indicates to me that property-rights considerations were, to say the least, insufficient by themselves to illuminate the proper disposition of that case. After all, if the proposition that a competent client can exercise "unassailable" ownership of his or her file were as true in *Burnett* as it seemingly is today,[16] why bother, in that case, to discuss the attorney-client privilege *at all*?

The reason, of course, is that a party's assertion of a property right, without more, does not—and *should not*—solely determine the extent of a trial judge's authority in these circumstances. In both *Burnett* and *George*, the litigants seeking to avoid respective court orders commanding them to dispose of their "property" in a certain fashion were expected to assert, in addition to their property interests, *something else*—some other definite legal protection or right that actually limited the authority of the trial judge. In *Burnett* this "something else" was the attorney-client privilege.[17] In *George* the "something else" was the

---

[16]

*See id.* at 13.

[17]

642 S.W.2d at 769.

threat of an actual conflict of interest.[18]  In this case I see no "something else"—I see only a bare assertion of a property right, and absolutely *no* argument as to how this property right is so inviolable as to be totally impervious to court order.[19]

Even if I have misread *Burnett* and *George*, I would remain of the opinion that property law alone gives no "clear" or "settled" resolution to the case before us.  There are still, in my mind, too many unanswered questions to admit of a such a clear resolution.  For instance: The Court addresses at length the wrongfulness of Judge Elliott's order to McCann to turn over his client's *physical* file, but curiously glosses over whether it would have been wrong, *per* Rytting's explicit request, to simply order McCann to relinquish a *copy* of the file.  How do we know whether such an order would *also* violate Turner's property rights (that is, which authorities provide a "clear" answer to *this* question)?  Is it because the file is just a physical embodiment of what is, in effect, Turner's *intellectual* property?  How do we know?  If Turner has an intellectual property interest in the contents of the file, how far does that interest extend?  All the way?  Less than all the way?  How do we know?  Does making a

---

[18]

28 S.W.3d at 512 (citing TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.09(a)).

[19]

It could be argued, I suppose, that Turner's property interest works in tandem with McCann's "fiduciary duty," Majority Opinion at 11 & n.14, to place limits on the trial court's authority to order a relinquishment of Turner's property.  But again, the fact that McCann has an ethical duty to his client does not necessarily imply that Judge Elliott has a clear legal duty to rule in favor of McCann.  And I do not understand how the aggregation of one arguably authority-limiting consideration (property rights) with one arguably *non*-authority-limiting consideration (fiduciary duty) results in a *decidedly* authority-limiting consideration that is somehow greater than the sum of its parts.

copy of the file and handing the copy to the client's current attorney violate that interest, whatever its extent? How do we know?

Again, I do not claim to have answers to these questions. I am simply pointing out that the Court's disposition *depends upon*, or at the very least suggests, the pre-existence of clear and definitive answers. Today the Court says for the first time what the law *is* in this area, but then treats its pronouncement as time-honored and long-established. Trial judges who find themselves the subject of our mandamus authority can only scratch their heads.

### Rytting's Dilemma: "A Lawyer Zealously Asserts the Client's Position"[20]

There was a time in our jurisprudence when this Court—and others—recognized the "discretionary" nature of mandamus relief.[21] This discretion, it was thought, existed even when the long-settled prerequisites for mandamus—a clear claim to relief and the absence of an adequate remedy at law—had been met.[22] Perhaps it was in view of this discretion that the Court ordered the parties in this case to brief a question that, on its face, appears not to

---

[20]

*See* TEX. DISCIPLINARY RULES PROF'L CONDUCT preamble ¶ 2 ("As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system.").

[21]

*See* George E. Dix and John M. Schmolesky, 43B TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 61:3, at 930 (3d ed. 2011) (citing *Dickens v. Second Court of Appeals*, 727 S.W.2d 542, 549 (Tex. Crim. App. 1987) ("Mandamus is an extraordinary writ, and is not issued as a matter of right, but rests largely in the sound discretion of the Court.") (citation omitted); *Lanford v. Fourteenth Court of Appeals*, 847 S.W.2d 581, 585 (Tex. Crim. App. 1993) ("[M]andamus is a drastic remedy, to be invoked only in extraordinary situations.") (alteration in original) (citation omitted)).

[22]

*Id*.

be grounded in the law as much as the potential ramifications of Turner's own self-defeating decision: "If the file belongs to the client (the defendant in the underlying case here), what are the possible consequences should the client refuse to turn over the file to subsequent counsel?"[23]

In its haste to find error in Judge Elliott's decision to override McCann's refusal to turn over Turner's file to Rytting, the Court fixates on the duties and dilemmas facing *McCann* in his own decision whether to turn over Turner's files, but wastes no ink to consider the dilemma faced by Rytting. The Court today does not even mention the "possible consequences" to Turner, notwithstanding the interest it evinced in its earlier briefing order. Again, given the "discretionary" nature of mandamus relief and the fact that mandamus is available only in "extraordinary situations,"[24] I am puzzled by the Court's reticence in this regard. Whatever the reason, since the Court has not undertaken to describe the consequences to Rytting and Turner should Judge Elliott's order be overturned, I will.

Rytting has an obligation—an ethical imperative—to review McCann's files on Turner for any signs of ineffective representation at the trial level. This obligation is apparent from a perusal through the admittedly nebulous and lofty expectations of the Disciplinary Rules of Professional Conduct:

---

[23] *In re McCann*, Nos. AP-76,998 & AP-76,999, 2013 WL 1149840, at *1 (Tex. Crim. App. Mar. 20, 2013) (per curiam) (not designated for publication).

[24] George E. Dix and John M. Schmolesky, 43B TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 61:3, at 930 (3d ed. 2011).

Lawyers, as guardians of the law, play a vital role in the preservation of society. As advisor, a lawyer provides a client with an informed understanding of the client's legal rights and obligations and explains their practical implications. *As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system.* A lawyer acts as evaluator by examining a client's affairs and reporting about them to the client or to others. In all professional functions, a lawyer should zealously pursue clients' interests within the bounds of the law. In doing so, a lawyer should be competent, prompt, and diligent. [P]ersonal involvement in the problems of the disadvantaged can be one of the most rewarding experiences in the life of a lawyer. In representing a client, a lawyer shall not . . . neglect a matter entrusted to the lawyer[.] *Competent representation contemplates . . . reasonable thoroughness in the study and analysis of the law and facts*, and reasonable attentiveness to the responsibilities owed to the client. A lawyer should feel a moral or professional obligation to pursue a matter on behalf of a client with reasonable diligence and promptness despite opposition, obstruction or personal inconvenience to the lawyer. [A] lawyer shall abide by a client's decisions . . . concerning the objectives and general methods of representation, [but] [*t*]*he lawyer should assume responsibility for the means by which the client's objectives are best achieved. Thus, a lawyer has very broad discretion to determine technical and legal tactics*[.] The advocate has a duty to use legal procedure for the fullest benefit of the client's cause[.] The advocate's task is to present the client's case with persuasive force.[25]

It is also apparent from a close study of the more concrete expectations of the Guidelines and

Standards for Texas Capital Counsel:

The objective of these Guidelines is to set forth a state-wide standard of practice for the defense of capital cases in order to ensure high quality legal representation for all persons facing the possible imposition or execution of a death sentence by any State of Texas jurisdiction. *Counsel at every stage have an obligation to conduct a full examination of the defense provided to the client at all prior phases of the case.* This obligation includes at a minimum interviewing prior counsel and members of the defense team and examining

---

[25]

TEX. DISCIPLINARY RULES PROF'L CONDUCT preamble ¶¶ 1-3, 6, R. 1.01(b)(1) & cmt. 1, 6, R. 1.02(a)(1) & cmt. 1, R. 3.01 cmt. 1, R. 3.03 cmt. 1 (emphases added and some ellipses omitted throughout).

the files of prior counsel. Counsel at every stage of the case, exercising professional judgment in accordance with these Guidelines, should [c]onsider all legal claims potentially available; and [*t*]*horoughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted*; and [e]valuate each potential claim in light of . . . [t]he importance of protecting the client's right against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited. Counsel who decide to assert a particular legal claim should [p]resent the claim as forcefully as possible, tailoring the presentation to the particular facts and circumstances in the client's case and the applicable law. Habeas corpus counsel must understand that the state habeas corpus proceeding is not a second direct appeal. Direct appeal-like, record-based claims are not cognizable in state habeas corpus and can be fatal to the capital client. Counsel should not accept an appointment if he or she is not prepared to undertake the comprehensive extra-record investigation that habeas corpus requires. [H]abeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation. [*C*]*ounsel has a duty to conduct a searching inquiry to assess whether any constitutional violations may have taken place, including . . . ineffective assistance of trial . . . counsel.* State habeas corpus counsel's lack of diligence, mistakes, missteps, and omissions will be attributed to the capital client and will follow the client throughout all remaining proceedings in state and federal court. It is a dereliction of habeas corpus counsel's duty to simply acquiesce to a capital client's insistence that he or she . . . wants to challenge only the conviction but not the sentence. Counsel must also inspect the evidence and obtain the files of trial and appellate counsel, scrutinizing them for what is missing as well as what is present. *Habeas corpus counsel must demand on behalf of the capital client all resources necessary to provide high quality legal representation*, to conduct a thorough investigation of both the conviction and sentence, to procure documentary evidence, and to retain experts. Habeas corpus counsel should consider every legal claim potentially available, and thoroughly investigate the basis for each potential claim[.][26]

These are the expectations—the *obligations*—confronting Rytting as he seeks access to

---

[26]

GUIDELINES AND STANDARDS FOR TEXAS CAPITAL COUNSEL 1.1(A), 11.1(B), 11.2(A), 11.2(B)(1), 12.2(B)(1)(b), 12.2(B)(2)(c), 12.2(B)(3)(b), 12.2(B)(6)(a), 12.2(B)(7)(b) (State Bar of Tex. 2006) (emphases added and some ellipses omitted throughout).

McCann's files on Turner.

And this is the reality he faces: Investigating a client's case beyond merely reading the direct appellate record—and reviewing trial counsel's case files *in particular*—is an indispensable first step in proving ineffective assistance of counsel at the trial level. This is because "[a] substantial risk of failure accompanies an appellant's claim of ineffective assistance of counsel on [a] direct appe[llate] . . . record."[27] On an appellate record, this Court will presume that "[trial] counsel's conduct fell within the wide range of reasonable professional assistance"—and in order to overcome this "strong presumption," a claimant must "affirmatively demonstrate the alleged ineffectiveness" *in the appellate record*.[28] But "[t]he record in a direct appeal may well contain a less than adequate inquiry into possible tactical reasons for various actions or omissions by counsel and may lack completely trial counsel's own explanations for his actions or inactions."[29] Indeed, one of the crucial purposes of habeas corpus proceedings is to *supplement* the appellate record so as to *demonstrate* trial counsel's ineffectiveness—in a way that the appellate record standing by itself typically will not. And while it might be said that Rytting could simply depose, seek affidavits from, or otherwise interview McCann to get the information he needs to prove

---

[27] *See Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

[28] *Id.* at 813-14.

[29] *Id.* at 814 n.5 (citing George E. Dix and Robert O. Dawson, 41 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 24.94 (2d ed. 1995)).

ineffectiveness outside the direct appellate record, the Guidelines specifically state that "habeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation."[30] To do so, in other words, would be to compromise an ethical duty.[31]

Even beyond filling in the important details of ineffectiveness claims that are hinted at within—but not apparent from—the record,[32] habeas counsel's review of trial counsel's

---

[30] GUIDELINES AND STANDARDS FOR TEXAS CAPITAL COUNSEL 12.2(B)(1)(b) (State Bar of Tex. 2006).

[31] Indeed, it is arguable that Rytting is ethically bound to at least investigate a claim of ineffective assistance *even against his client's expressed wishes*. *Cf. Summerlin v. Schriro*, 427 F.3d 623, 638-39 (9th Cir. 2005) ("[A] lawyer's duty to investigate [mitigation issues] is virtually absolute, regardless of a client's expressed wishes . . . [E]ven when faced with client directives limiting the scope of defense, an attorney must conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client.") (internal quotation marks omitted) (quoting *Silva v. Woodford*, 279 F.3d 825, 838-46 (9th Cir. 2002)); *Harries v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005) ("[A] 'defendant['s] resistance to disclosure of information does not excuse counsel's duty to independently investigate.'") (quoting *Coleman v. Mitchell*, 268 F.3d 417, 449-50 (6th Cir. 2001)); *Thompson v. Wainwright*, 787 F.2d 1447, 1451 (11th Cir. 1986) ("[A] lawyer[] may not 'blindly follow' [the client's] commands [because] although the decision whether to use [mitigation] evidence in court is for the client . . . the lawyer first must evaluate potential avenues and advise the client of those offering possible merit.") (quoting *Foster v. Strickland*, 707 F.2d 1339, 1343 (11th Cir. 1983)). In any event, this Court has yet to hold otherwise. And the ineffectiveness of trial counsel is, to say the least, an extremely important claim to make, as evidenced by the fact that it is one of the most often-litigated claims in a writ application. *See* Gary Udashen, *Designating and Determining Issues on An Applications for Writ of Habeas Corpus*, Texas Center for the Judiciary 2009 Writs Training Conference at 6 (2009).

[32] For example, at the October 7, 2011 OCW-McCann hearing, the following exchange took place between Turner and counsel for McCann:

[Counsel for McCann:] Do you think that Mr. McCann did a good job in your trial?

[Mr. Turner:] (Shakes head negatively).

files serves other important purposes in the preparation of an initial application for state habeas corpus relief. It can reveal whole swaths of a client's circumstances that, were they simply not presented at trial, this Court might presume were left out for strategic purposes, but upon review of the file in its *entirety* would be more properly characterized as instances of trial counsel's neglect or poor judgment—and potentially his ineffectiveness.[33] Habeas counsel's review of trial counsel's files can, in addition, serve to aid the investigation of claims *unrelated* to trial counsel's ineffectiveness. It can serve, for example, as a starting point for looking into whether the State possesses undisclosed exculpatory evidence,[34] or whether evidence exists that might establish the client's actual innocence.[35] Moreover, such a review can assist counsel to separate specious claims of all kinds from those with potential merit. In short, reviewing trial counsel's files provides an array of advantages to initial state habeas corpus counsel by aiding him in his considerable investigatory task *in addition to*

[Counsel for McCann:] Is that a no?

[Mr. Turner:] (No response).

[Counsel for McCann:] You can say it. It's okay. You're not going to hurt anybody's feelings.

[Mr. Turner:] No.

[33] *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510 (2003).

[34] *See, e.g.*, *Brady v. Maryland*, 373 U.S. 83 (1963).

[35] *See, e.g.*, *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996).

providing substance and depth to claims that might not otherwise stand a chance at succeeding.

So should the Court overturn Judge Elliott's order today, Turner may have to submit his initial state habeas application—which will set the tone of his entire post-conviction pursuit of relief—with claims of the ineffectiveness of trial counsel that lack meaningful substantiation. Being purely record-based, these claims would probably fail to "allege[]facts that, if true, might entitle him to relief."[36] If this is the case, he will most likely be denied an evidentiary hearing to develop the facts—since he has been unable to *allege* concrete facts.[37] Instead, he will limp into federal court with what little fact-development he could muster from his investigation *sans* trial counsel's files, and this meager federal review will avail him little, if anything. And at the end of it all, Turner may very well be executed without ever having a genuine shot at proving that his trial counsel's assistance was deficient.

Judge Elliott believed it possible to resolve McCann and Rytting's ethical dilemma, and at the same time assure Turner the "competent counsel" that Article 11.071 envisions,[38] by granting Rytting access to Turner's files. Perhaps his decision was overly paternalistic. Perhaps it was ill-advised. Perhaps it was even arguably incorrect as a matter of law

---

[36] *See Ex parte Medina*, 361 S.W.3d 633, 638 n.10 (Tex. Crim. App. 2011).

[37] *Id.* at 637-38 (where a habeas applicant makes conclusory allegations in his initial writ application, even remanding to the trial court for further factual development is inappropriate).

[38] TEX. CODE CRIM. PROC. art. 11.071, § 2.

(although I doubt it). Nevertheless, I am unwilling to subject a trial judge to the stigma of mandamus for a decision that was merely *arguably* incorrect. Mandamus is only appropriate when a relator's claim for relief is "clear"—not arguable—and a claim for relief can only be "clear" when the law undergirding the claim is "well-settled."[39] I think that the law in this area is demonstrably unsettled; at the very least it is *insufficiently* well settled to justify the extraordinary measure of mandamus. And even if I were wrong in this regard, I would think it inappropriate to exercise our discretion so as to prevent a trial judge from saving a capital habeas applicant—even one who has not been declared incompetent—from his own manifest paranoias. I respectfully dissent.

FILED:      November 20, 2013
PUBLISH

---

[39] *In re State ex rel. Weeks*, 391 S.W.3d 117, 122 (Tex. Crim. App. 2013).