**Opinion filed January 25, 2024**



## In The

# Eleventh Court of Appeals

_____

### No. 11-22-00031-CR

_____

### WILLIE OTEY HENDERSON, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 238th District Court**
**Midland County, Texas**
**Trial Court Cause No. CR52697**

## M E M O R A N D U M   O P I N I O N

The jury found Appellant, Willie Otey Henderson, guilty of one count of murder and two counts of tampering with evidence. *See* TEX. PENAL CODE ANN. §§ 19.02(b), 37.09 (West Supp. 2023). The jury also found the enhancement paragraphs to be true and assessed Appellant's punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for sixty years

for the murder conviction and for ten years for each tampering-with-evidence conviction. Appellant challenges his murder conviction in two issues. We affirm.

*Background Facts*

On October 21, 2018, Marcus Anthony Rubio and Joe Matthew Rubio went to check on their brother, Michael Rubio,[1] at his apartment at the Midland Square Apartments. Rubio had missed work on October 20, and his friends, family, and coworkers had been unable to reach him. Jeremy Burns, Rubio's friend, was waiting for the brothers outside the apartment when they arrived. Joe used a spare key to Rubio's apartment and unlocked the front door. The three men saw Rubio laying on the floor in the doorway. Marcus called 9-1-1 and told the dispatcher that his brother was dead.

When Sergeant Detective Saul Bernal with the Midland Police Department arrived at Rubio's apartment on October 21, paramedics informed him that a deceased male was in the doorway of the apartment. Sergeant Bernal entered the apartment and noticed a bottle of Clorox bleach and a knife in the kitchen area. Officer Jeffrey Sommer with the Midland Police Department recalled a "pungent" bleach smell in the apartment. Officers initially suspected Rubio had been stabbed to death because of the knife and bleach on the counter. Marisa Payne, a crime scene investigator with the Midland Police Department, photographed a shoeprint left in the mud by Rubio's front door and a partial shoeprint with a diamond pattern left in the blood on Rubio's floor.

Sergeant Bernal testified that he initially thought a robbery had taken place in Rubio's apartment because drawers throughout the apartment were open and appeared rummaged through. However, Sergeant Bernal noticed things of value, like Rubio's television, were still in the apartment. Marcus and Joe testified that

---

[1]All references in this opinion to "Rubio" are to the decedent, Michael Rubio.

Rubio's apartment was not in a state he would have left it in, and Marcus described Rubio as a very "neat" person. Marcus and Joe both knew that Rubio sold illegal drugs "on the side," and Joe testified that Rubio was planning on "slowly but surely stop[ping] altogether."

Officer Sommer learned that the pickup Rubio drove for his job was missing. After obtaining the pickup's GPS location, Officer Sommer found it parked at a nearby apartment complex. While crime scene investigators processed the pickup, Officer Sommer and other officers began walking around the area in between the two apartment complexes to search for any additional evidence. Officers found two cell phones discarded in a "trench" located between the two apartment complexes. The cell phones were missing their SIM cards. Officer Sommer surmised the two phones had been placed in the trench recently because they were not yet covered in dirt. At least one cell phone was identified as belonging to Rubio. Officers were unable to download content from the other cell phone in the trench because it had been "factory reset," meaning that its contents had been "wiped out."

Sergeant Rosemary Sharp, a detective with the Midland Police Department, attempted to speak with Rubio's neighbors. One of the apartments that Sergeant Sharp visited belonged to Appellant and Joyce Jennings. Sergeant Sharp could see movement through the apartment blinds, but no one answered the door when officers initially tried to make contact. However, officers were admitted to and searched Appellant and Jennings's apartment later that day. Officers did not find anything of note during this search.

On October 22, the day after Appellant and Jennings's apartment was searched, Jennings contacted the police department. Sergeant Sharp met Jennings at her and Appellant's apartment. Jennings invited Sergeant Sharp into the apartment and began "pointing out" things that were not in the apartment when it was searched the day before. Jennings pointed out clothing and a pair of black shoes

she claimed belonged to Appellant, a "charger" in the bathroom that appeared to have blood on it, and a "corner piece of a clear plastic baggie" indicative of narcotics packaging that also appeared to have blood on it. Crime scene investigator Payne processed Appellant's apartment and collected a pair of gray sweatpants, a pair of black Nike Air Jordan shoes, a black and white "baseball shirt," a left white Nike tennis shoe, a black Motorola phone, a white "wall plug, or phone charger," the torn corner of a plastic baggie, a pair of safety glasses, and a white T-shirt. Payne also took custody of items officers had collected from Appellant's apartment, including a gray hooded sweatshirt and a pair of gray pants.

While Sergeant Sharp was at Appellant's apartment, she was notified that Appellant had arrived at the police department ostensibly "wanting to turn himself in." Sergeant Sharp was present when another detective interviewed Appellant. Sergeant Sharp testified that Appellant was "smiling and smirking" whenever he was asked about Rubio being stabbed. Appellant said that he was not involved in Rubio's murder and that he did not stab Rubio. When Rubio's autopsy was performed on Tuesday, October 23, officers learned that Rubio had been shot rather than stabbed. Sergeant Sharp later concluded that Appellant was smiling during his interview because "he was being honest, he did not stab [Rubio]." Sergeant Sharp also testified that Appellant lied when he said that he was wearing the same clothing during his interview as he was wearing on October 21; video footage from a local business taken on October 21 showed Appellant wearing different clothing.

Dr. Tasha Greenberg of the Tarrant County Medical Examiner's Office performed an autopsy on Rubio's body. Her external examination revealed an injury on Rubio's torso and right hand. She determined that the torso injury was a gunshot entrance wound and the hand injury was a grazed gunshot wound. The bullet that entered Rubio's torso, went into his abdomen, through his liver and inferior vena

cava, and into the second lumbar vertebra through his spinal cord. Dr. Greenberg testified that the gunshot wound to the abdomen was the cause of death.

Appellant confirmed during his interview that the black shoes found in his apartment belonged to him. Sergeant Sharp testified that officers were interested in the shoes because the pattern on the soles of the shoes were similar to the pattern made by the partial shoeprint found in blood in Rubio's apartment. Additionally, Rubio's friend, Virgilio Martinez, testified that he saw Appellant standing outside Rubio's apartment smoking a cigarette on October 14.

Sergeant Sharp testified that another neighbor of Rubio's, Michael Jackson, was a person of interest during the murder investigation. Officers searched Jackson's apartment and noted that there was blood and possibly cocaine in the apartment. While conducting surveillance at the Midland Square Apartments complex, Sergeant Sharp saw Jackson exit his apartment with something in his hands, approach a vehicle, speak to whoever was inside the vehicle, and return to his apartment without the item. Officers were unable to stop the vehicle and recover the item, but Sergeant Sharp was interested in the interaction because Appellant had been in Jackson's apartment on October 21. Officers subsequently searched Jackson's apartment and noted the presence of blood throughout the apartment. Jackson was found hiding in a closet. Despite this, there was no DNA evidence connecting Jackson to Rubio's death, and Jackson was never arrested in connection with Rubio's murder.

Brandon Mount, a forensic biology analyst with the Texas Department of Public Safety's (DPS) Crime Lab in Lubbock, received several items of evidence for testing. After a T-shirt, pair of gray sweatpants, and the black shoes belonging to Appellant tested presumptively positive for blood, Mount swabbed each item for DNA analysis. Mount testified that the wall charger and plastic baggie also tested presumptively positive for blood. Mount also swabbed the two cell phones

5

recovered from the trench for DNA. Mount removed the back cover of each phone and swabbed around the area where the SIM card would have been had they not been removed.

Charity Hubbard, a forensic scientist with the DPS Crime Lab in Lubbock, testified about the results of the DNA testing that had been completed. She testified that one of the blood stains on Appellant's shoes came from a single individual, that it was consistent with Rubio's DNA, and that the likelihood of it being from an unknown person was one in 758 octillion. With respect to Rubio's cell phone, a DNA profile was identified on it to be a mixture of three individuals, that Jennings's DNA could not be excluded as a contributor of DNA in the profile, and the likelihood of the DNA being from three unknown individuals was one in 4.19 million. With respect to the other cell phone that the police located along with Rubio's cell phone, a DNA profile was identified on it to be a mixture of three individuals, that Appellant's DNA could not be excluded as a contributor of the DNA in the profile, and the likelihood of the DNA being from three unknown individuals was one in 837 quintillion. Neither Appellant's nor Jennings's DNA was present in Rubio's apartment. Ultimately, Appellant was arrested for Rubio's murder, and Jennings was arrested for tampering with evidence connected to Rubio's murder.

*Analysis*

In his first issue, Appellant contends that the evidence at trial was insufficient to support the jury's guilty verdict for murder because "there was plainly reasonable doubt" raised by the evidence. We review a challenge to the sufficiency of the evidence, regardless of whether it is denominated as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the

6

verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we consider all the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Instead, appellate courts must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017).

To determine whether the State has met its burden under *Jackson* to prove a defendant's guilt beyond a reasonable doubt, we compare the elements of the crime as defined by the hypothetically correct jury charge to the evidence adduced at trial. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.* When, as here, the trial court's charge authorized the jury to convict the defendant on more than one theory, the verdict of guilt will be upheld if the evidence is sufficient on any theory authorized by the charge. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (citing *Rabbani v. State*, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992)).

Count I of the final re-indictment charged Appellant as follows:

WILLIE OTEY HENDERSON, hereinafter styled Defendant, on or about 21st day of October, 2018, and before the presentment of this indictment, in the County and State aforesaid, did then and there intentionally and knowingly cause the death of MICHAEL RUBIO, an individual, by shooting the said MICHAEL RUBIO with a firearm, a deadly weapon,

[A]nd the Grand Jurors upon their oaths aforesaid do further present in and to said Court that the Defendant on or about the 21st day of October, 2018, and before the presentment of this indictment, in the County and State aforesaid intending to cause serious bodily injury to an individual, MICHAEL RUBIO, did then and there commit an act clearly dangerous to human life, to-wit: shooting a firearm at and in the direction of the said MICHAEL RUBIO, thereby causing the death of MICHAEL RUBIO.

8

The two methods of committing murder alleged in the indictment are not separate offenses but, rather, alternative methods of committing the same offense. *Walter v. State*, 581 S.W.3d 957, 968 (Tex. App.—Eastland 2019, pet. ref'd) (citing *Smith v. State*, 436 S.W.3d 353, 378 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd)); *see* PENAL § 19.02(b)(1)-(2).

In addition to charging Appellant under the two different theories of murder presented in the final re-indictment, the trial court's charge allowed the jury to convict Appellant either as a primary actor or as a party with Jennings or "a person unknown." Under Section 7.01 of the Penal Code, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." PENAL § 7.01(a) (West 2021); *see Adames v. State*, 353 S.W.3d 854, 862 (Tex. Crim. App. 2011). The trial court's charge permitted the jury to find that Appellant was criminally responsible for the conduct of Jennings or a person unknown under Section 7.02(a)(2) of the Penal Code. *See* PENAL § 7.02(a)(2). This statute provides that "[a] person is criminally responsible for an offense committed by the conduct of another if: . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.*; *see Adames*, 353 S.W.3d at 862.

Appellant directs his sufficiency challenge on multiple aspects of the evidence in this case. He initially asserts that there is no evidence that Appellant owned or possessed a firearm or used or discharged a firearm; that he asked or solicited another person to shoot Rubio or that he assisted whoever shot Rubio; and that there is no evidence that he tampered with Rubio's body. Appellant also contends that the police lost evidence in the case and did not handle items of evidence properly, and that Rubio was a drug dealer that may have aggrieved either his supplier or his customers.

We first note that when conducting an evidentiary review, "[w]e do not review the sufficiency of the police investigation; we review the evidence presented at trial." *Quinonez v. State*, No. 06-07-00016-CR, 2007 WL 2608833, at *4 (Tex. App.—Texarkana Sept. 12, 2007, pet. ref'd) (mem. op., not designated for publication); *see Espinoza v. State*, No. 11-19-00232-CR, 2022 WL 3903774, at *5 (Tex. App.—Eastland Aug. 31, 2022, pet. ref'd) (mem. op., not designated for publication). "[W]e do not consider what evidence the State could have or even should have presented." *Quinonez*, 2007 WL 2608833 at *4. We also do not speculate about the evidence that the State did not present. *McLemore v. State*, No. 05-15-00160-CR, 2015 WL 9591398, at *3 (Tex. App.—Dallas Dec. 31, 2015, no pet.) (mem. op., not designated for publication) (citing *Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012)); *see Espinoza*, 2022 WL 3903774 at *5. Further, we do not usurp the role of the factfinder by factoring into our sufficiency analysis an alternative hypothesis inconsistent with the guilt of the accused. *Jenkins v. State*, 493 S.W.3d 583, 601 (Tex. Crim. App. 2016).

There is ample circumstantial evidence that supports Appellant's conviction. The State presented evidence that a (1) blood stain was present on Appellant's shoes (2) that Rubio could not be excluded as the contributor of the DNA profile connected to the blood stain, and (3) the likelihood of it being contributed by another individual was one in 758 octillion. A shoeprint consistent with those shoes was found in Rubio's apartment near his body. This evidence would allow a rational jury to infer and conclude that Appellant was present in Rubio's apartment at the time that he was murdered and that Appellant was an active participant in the murder.

Additionally, Appellant could not be excluded as a contributor of DNA found on a cell phone located next to Rubio's cell phone, and Jennings could not be excluded as a contributor of DNA found on Rubio's cell phone. The SIM cards for both phones had been removed and one phone had been factory reset. These items

of evidence permitted the jury to infer that Appellant participated in the effort to conceal his involvement in Rubio's murder. Also, Appellant was seen standing outside Rubio's apartment a few days before his death. Finally, testimony was presented that Appellant's demeanor during his interview indicated that he knew Rubio was not stabbed.

Reviewing courts are required to consider the combined force of all of the evidence. *Merritt*, 368 S.W.3d at 526 (citing *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011)). Viewed in the light most favorable to the verdict, we conclude that there is sufficient evidence from which a rational trier of fact could have concluded beyond a reasonable doubt that Appellant committed the murder of Rubio as either the primary actor or as a party. *See Jackson*, 443 U.S. at 319. We overrule Appellant's first issue.

In his second issue, Appellant contends that the trial court erred when it included a law-of-parties instruction in its charge. We review a claim of jury charge error using the procedure set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). *See State v. Ambrose*, 487 S.W.3d 587, 594 (Tex. Crim. App. 2016). Our first duty in analyzing a jury charge issue is to decide whether error exists. *Arteaga v. State*, 521 S.W.3d 329, 333 (Tex. Crim. App. 2017) (citing *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009)). If error exists, we must determine whether the error caused sufficient harm to warrant reversal. *Id.* If a timely objection was lodged at trial, reversal is required if the error resulted in "some harm" to the defendant. *Elizondo v. State*, 487 S.W.3d 185, 204 (Tex. Crim. App. 2016).

Appellant objected to the inclusion of the instruction on the law of parties in the trial court's charge based on his contention that there was no evidence to support its submission. Appellant maintains on appeal that the State presented "zero evidence" that Appellant and Jennings had any common understanding or design.

11

Appellant does not specifically assert that the trial court's error caused him some harm but asserts that the State's request for a law-of-parties instruction was "an attempt to gain a conviction without sufficient proof."

Generally, the trial court may instruct the jury on the law of parties if "there is sufficient evidence to support a jury verdict that the defendant is criminally responsible under the law of parties." *Ladd v. State*, 3 S.W.3d 547, 564 (Tex. Crim. App. 1999). "Regardless of whether it is pled in the charging instrument, liability as a party is an available legal theory if it is supported by the evidence." *In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013). The State does not have to prove it is correct regarding the defendant's participation as a party; instead, the State must only show that the evidence raises the issue to be entitled to its submission. *Id.* at 125. Thus, a trial court errs by submitting an instruction under the law of parties if the evidence adduced at trial would not support a jury verdict under the law of parties. *Ladd*, 3 S.W.3d at 564.

The jury is entitled to consider the events that took place before, during, and after the commission of the crime. *See Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004); *Goff v. State*, 931 S.W.2d 537, 545 (Tex. Crim. App. 1996). "There must be sufficient evidence of an understanding and common design to commit the offense." *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012) (citing *Guevara*, 152 S.W.3d at 49). "Each fact need not point directly to the guilt of the defendant, as long as the cumulative effect of the facts are sufficient to support the conviction under the law of parties." *Id.* (citing *Guevara*, 152 S.W.3d at 49). Mere presence of a person at the scene of a crime—either before, during, or after the offense—or even flight from the scene, without more, is insufficient to sustain a conviction as a party to the offense; however, combined with other incriminating evidence, it may be sufficient to sustain a conviction. *Thompson v. State*, 697 S.W.2d 413, 417 (Tex. Crim. App. 1985); *accord Gross*, 380 S.W.3d at 186.

12

Additionally, allegations that a party is guilty under the law of parties need not be specifically pleaded in the indictment. *See Barrera v. State*, 321 S.W.3d 137, 144 n.1 (Tex. App.—San Antonio 2010, pet. ref'd).

As discussed above, a jury could have rationally concluded that Appellant was present at the scene of the crime, which is a relevant circumstance for proving party status. *See Medellin v. State*, 617 S.W.2d 229, 231 (Tex. Crim. App. 1981). While Appellant asserts that there is no evidence of an understanding between Appellant and Jennings, Appellant and Jennings lived together, and both Appellant and Jennings separately approached the police after evidence appeared in their apartment the day after it was searched. Evidence was presented that connected Appellant to Rubio in the form of a DNA profile consistent with Rubio's DNA being found on Appellant's shoes. Further, a DNA profile consistent with Jennings's DNA was found on Rubio's cell phone and a DNA profile consistent with Appellant's DNA was found on a cell phone located with Rubio's cell phone. This evidence ties Jennings and Appellant together with respect to Rubio's murder. Sergeant Bernal testified that the state of Rubio's apartment indicated that someone was "looking for something." Rubio's brothers testified that Rubio sold illegal drugs, and a plastic baggie consistent with narcotics packaging was found in Appellant's and Jennings's apartment.

Accordingly, the State presented sufficient evidence from which the jury could have rationally inferred that Appellant and Jennings were both involved in Rubio's murder. *See In re State ex rel. Weeks*, 391 S.W.3d at 125. Because the evidence at trial could have supported a jury verdict under the law of parties, the trial court did not err in including the instruction in its charge. *See Ladd*, 3 S.W.3d at 564. We overrule Appellant's second issue.

*This Court's Ruling*

We affirm the judgment of the trial court.


JOHN M. BAILEY

CHIEF JUSTICE


January 25, 2024

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.