# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00496-CR

---

**Garry Lynn Jennings, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 391ST DISTRICT COURT OF TOM GREEN COUNTY
### NO. D-17-0985-SB, THE HONORABLE BRAD GOODWIN, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Garry Lynn Jennings appeals his convictions, after a jury trial, for murder, aggravated kidnapping, and tampering with physical evidence (a human corpse). *See* Tex. Penal Code §§ 19.03, 20.04, 37.09. He was sentenced to 20 years in prison for each offense, to run concurrently. He complains that (1) the trial court erred in charging the jury on conspiracy liability and (2) the evidence for each offense is insufficient. We affirm.

## BACKGROUND

The State's theory of the offenses involved a plot by Stephen Jennings, his then-wife Kristen Dean, and his father Garry Lynn Jennings (Jennings), to get the victim, Eric Torrez, to drive from Abilene, where he lived and worked, to San Angelo, where Stephen and Dean lived. Torrez was Dean's ex-husband, and the two had two children together, a three-year-old-boy X.T., and a four-year-old-girl, E.T.

X.T. lived with Stephen and Dean, but E.T. lived with Torrez. Dean was unhappy with some recent court rulings and wanted to get E.T. from Torrez. The State's theory was that Stephen would lure Torrez away from Abilene so that Dean and Jennings could pick E.T. up and take her home to San Angelo. The plot involved Stephen pretending to be a potential customer ("Daryl") for Torrez's business. When the first plot to meet Torrez on neutral ground went awry, the plot evolved. Now, Stephen would lure Torrez to Stephen and Dean's home on Duckworth Road under the guise of bidding for a concrete job.

Before Torrez arrived, Dean and Jennings picked up X.T. and took X.T. to Angella Wray's residence to get him out of the house. Meanwhile, David Navarro arrived at the Duckworth house to provide "muscle."

After Torrez arrived, Stephen had Navarro tie Torrez up and they held Torrez at gunpoint in an empty bedroom. Eventually, after beating him up, they obtained information about which daycare E.T. attended in Abilene and his home address. According to Navarro, as he was walking out of the house, Jennings came inside and headed to the room where Torrez was being held. Jennings was wearing dishwashing gloves. Navarro did not see Dean, and did not see the Chrysler that Dean and Jennings had been driving. According to Dean, she waited in the Chrysler while Jennings went inside the house for five or ten minutes, and then Jennings came out of the house with a piece of paper with the relevant addresses on it. Dean did not see Navarro, but his truck was still there. Jennings moved Torrez's truck away from the Duckworth house and left his own phone in the truck before they headed to pick up E.T.

Dean and Jennings went to the daycare Torrez had identified and learned that the child had been picked up by Torrez's mother, Delores Cortez. They then drove to Torrez's house and Dean forcefully took the child from Cortez. While they drove back to San Angelo, Stephen

called and told them that Torrez was dead. Jennings, wearing latex gloves, drove Torrez's truck from where he had earlier stashed it to a Walmart parking lot and went with Stephen to pick up cleaning supplies at a Home Depot. Other evidence suggested that Stephen traveled to Crockett County and dumped Torrez's body in an empty field.

After Torrez had been missing for some time, investigators focused on Stephen as a suspect and searched his home, truck, and cell phone. Searches of the home produced biological material that was to be sent to a Department of Public Safety (DPS) lab for DNA testing. And evidence obtained from Jennings during an interview and from Stephen's cell phone helped lead investigators to the empty field where Torrez's body was recovered.

At trial, the State offered evidence of the results of the DNA testing—Torrez's DNA was very likely present in Stephen's home. The State offered other testimony and exhibits tending to prove its theory of Jennings's offenses. Several accomplices in the scheme, including Dean, Navarro, and Wray testified. Many exhibits consisting of cell phone data and communications and surveillance videos that showed the movements and communications of the various actors were admitted.

The trial court submitted party liability and conspiracy liability charges. Ultimately, the jury convicted Jennings of the three offenses and assessed punishment at 20 years' imprisonment for each offense, to run concurrently.[1] The trial court rendered judgment on the verdicts, and Jennings now appeals.

---

[1] Stephen Lynn Jennings was convicted, after a jury trial, for capital murder, aggravated kidnapping, and tampering with physical evidence (a human corpse). *See Jennings v. State,* No. 03-22-00001-CR, 2023 WL 8040781, at *1 (Tex. App.—Austin Nov. 21, 2023, no pet.) (mem. op., not designated for publication). Dean, Navarro, and Wray all made plea-bargain deals with the State in exchange for their testimony.

## ANALYSIS

### *Jury Charge*

Jennings argues that the trial court erred in charging the jury on conspiracy liability because the crime of conspiracy was not alleged in the indictment.

### *Standard of Review*

We must review all alleged jury-charge error, regardless of preservation in the trial court. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). The first question in analyzing a jury-charge issue is whether the charge contains error. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). Then, if the charge contains error, we analyze that error for harm. *Id*. Under *Almanza*, jury charge error requires reversal for "some harm" if the defendant objected, or "egregious harm" if the defendant did not. *Id*. at 743–44.

### *Application*

Jennings argues that the inclusion of the theory of conspiracy in the court's charge constituted error because the offense of conspiracy had not been alleged in the indictment.[2] He argues that he had no notice that he was being charged with the offense of criminal conspiracy, or what overt acts the State was going to rely on, so the jury was erroneously instructed on an alternate theory of conviction.

---

[2] Jennings complains that the trial court erred in submitting a jury charge of conspiracy liability on all three offenses, but the court submitted a jury charge on conspiracy liability only on the murder charge

4

But the court's charge did not instruct the jury to consider whether Jennings was guilty of the separate offense of criminal conspiracy as set out in Section 15.02.[3] Rather, the court's charge included the liability charge set out in Section 7.02(b)—the conspirator liability charge:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. In this subsection, "conspiracy" means an agreement between two or more persons to commit a felony.

Tex. Penal Code § 7.02(b).

The law of parties also may be applied to a case even though no such allegation is contained in the indictment; regardless of whether it is pled in the charging instrument, liability as a party is an available legal theory if it is supported by the evidence. *Marable v. State*, 85 S.W.3d 287, 287–88 & n.3 (Tex. Crim. App. 2002); *Montoya v. State*, 810 S.W.2d 160, 165 (Tex. Crim. App. 1989). "This rule applies not only to the law of parties found in Section 7.02(a)(2) but also the law of parties found in Section 7.02(b)." *Montoya*, 810 S.W.2d at 165; *see also State ex rel. Newell*, 712 S.W.3d 963, 971 (Tex. App.—Austin 2025, no pet.) (recognizing that State is entitled to pursue any available theories of criminal liability to broadest extent possible and that regardless of whether it is pled in charging instrument, liability as party is available legal theory if it is supported by evidence).

---

[3] "A person commits criminal conspiracy if, with intent that a felony be committed: (1) he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and (2) he or one or more of them performs an overt act in pursuance of the agreement." Tex. Penal Code § 15.02(a).

5

Because Jennings was not charged with the crime of conspiracy, and conspirator liability need not have been pled in the indictment, we overrule this jury-charge issue. *Ngo*, 175 S.W.3d at 743; *Marable*, 85 S.W.3d at 287–88 & n.3; *Montoya*, 810 S.W.2d at 165; *State ex rel. Newell*, 712 S.W.3d at 971.

## *Sufficiency*

Jennings argues that the evidence proved only that (1) Jennings accompanied Dean to find E.T.; (2) Jennings accompanied Dean to drop the children at Wray's house; and (3) Jennings accompanied Stephen to Home Depot to buy the materials which could have been used to bury the body after the fact. Jennings argues there is no evidence that he was criminally responsible for the conduct of Stephen.

### *Standard of Review and Applicable Law*

The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence. *See Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979). In assessing the sufficiency of the evidence to support a criminal conviction, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

The sufficiency of the evidence is measured by comparing the evidence produced at trial to "the essential elements of the offense as defined by the hypothetically correct jury

charge." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct jury charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*. The law "authorized by the indictment" consists of the statutory elements of the offense as modified by the indictment allegations. *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000). "Party liability is as much an element of an offense as the enumerated elements prescribed in a statute that defines a particular crime." *In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013).

Under Texas Penal Code § 7.02 a person may be criminally responsible for an offense committed by the conduct of another under *party liability* or *conspirator liability*. Tex. Penal Code § 7.02.

Under *party liability*, a person is criminally responsible for an offense committed by the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id*. § 7.02(a)(2). To prove the intent-to-promote-or-assist element, the State must show that it was the defendant's conscious objective or desire for the primary actor to commit the crime. *Metcalf v. State*, 597 S.W.3d 847, 856 (Tex. Crim. App. 2020). And the intent must have been formed contemporaneously with, or before, the crime alleged was committed. *Id*.

As described above, under *conspirator liability*, a person is criminally responsible for an offense committed by the conduct of another if, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, so long as that offense was committed in furtherance of the unlawful purpose and was one that should have been

7

anticipated as a result of the carrying out of that conspiracy. Tex. Penal Code § 7.02(b). Section 7.02(b) does not require the State to prove that the conspirator in fact anticipated the secondary felony, only that the crime is one that should have been anticipated. *Anderson v. State*, 416 S.W.3d 884, 889 (Tex. Crim. App. 2013). An appellate court "focuses on an examination of the totality of the circumstances to determine whether, on the facts of each case, a particular offense committed by a co-conspirator was 'reasonably foreseeable' within the scope of the unlawful agreement." *Id*.

*Application*

The trial court gave a *party liability* charge for all three crimes; it gave a *conspirator liability* charge for only the murder.

At trial, the defense conceded that the State's evidence showed that:

1) Jennings conspired with Stephen and Dean to help get E.T.;

2) Stephen and Dean picked up Jennings from his home in the Dallas/Fort Worth area, in their Chrysler a couple of days before the plot was executed;

3) Jennings brought guns;

4) Stephen used Jennings's phone to communicate with Torrez;

5) Jennings helped Dean get X.T. away from the Duckworth house before Torrez arrived;

6) Stephen kidnapped Torrez;

7) Jennings helped Dean retrieve E.T.;

8) Stephen killed Torrez;

9) Jennings went to Home Depot with Stephen to buy cleaning and disposing-of-a-body supplies; and

10) Stephen disposed of the body in Crockett County.

With these liability theories and concessions in mind, we examine the sufficiency of the evidence.

***Tampering With Physical Evidence***

As is relevant here, a person commits an offense of tampering with physical evidence if the person "knowing that an offense has been committed, alters, destroys, or conceals [a human corpse] with intent to impair its verity, legibility, or availability as evidence in any subsequent investigation of or official proceeding related to the offense." Tex. Pen. Code § 37.09(c), (d)(1).

First, a jury could rationally find that Stephen killed Torrez (and thus knew that an offense had been committed) then concealed Torrez's corpse by wrapping it up and dumping it in another county, with intent to impair its availability as evidence in any subsequent investigation of or official proceeding related to the murder. *Id*. The jury heard Jennings's statements that Stephen called and said that Torrez was dead; Jennings saw Torrez's dead body; and Stephen drove off with Torrez's body in the Chrysler. Torrez's body was found in an empty field in another county—and only after the Texas Rangers extracted information from the phones and statements of those involved. A rational trier of fact could have found that Stephen committed the offense of tampering with evidence beyond a reasonable doubt. *Id*.

Second, a jury could rationally find Jennings criminally responsible for the tampering offense committed by Stephen because Jennings acted with intent to promote or assist Stephen's commission of tampering and aided Stephen in committing the offense. *Id*. §§ 7.02(a)(2); 37.09(c), (d)(1). For one thing, Jennings accompanied Stephen to Home Depot to purchase cleaning and disposing-of-a-body supplies. Surveillance video captured the Chrysler

9

pulling into Home Depot parking lot on July 21, 2017 around 7:50 p.m.; Stephen and Jennings entering Home Depot around 7:51; Stephen and Jennings using the self-checkout station around 8:22 to purchase HDX bleach, HDX outdoor bleach, heavy duty duct tape, disposable latex gloves, and two large self-adhesive film surface shields; Stephen and Jennings exiting the Home Depot at around 8:23; and the Chrysler pulling out of the Home Depot parking lot. Cell data had Stephen texting Dean during this time; Stephen said he was at Home Depot, looking for a UV light. Officers found HDX bleach at the Duckworth house.

For another, Jennings admitted he moved Torrez's body. Jennings made a statement to the Texas Rangers that:

> I observed Eric Torrez dead on the floor, he had a bullet hole in his head. . . . I helped clean up the blood by mopping and directing Stephen what to do. I grabbed the body by the socks and tried to scoot it over to help clean the scene, but my back is disabled and the body was too much weight for me to lift. I helped Stephen get the body to the back door and then I was done. Somehow Stephen was able to lift the body and load it into the trunk of the Chrysler passenger car he has. I did not witness the body being loaded into the car. I don't know if he put anything down in the trunk to keep blood out of the trunk but I'm sure he did. . . . Before Stephen left, I went and [laid] down on the bed in the Southeast bedroom. I closed my eyes and I'm sure Stephen left shortly after that. The next morning when I woke up, the body was gone.

The State therefore presented evidence supporting a jury finding that it was Jennings's conscious objective or desire for Stephen to get rid of the body. *See Metcalf*, 597 S.W.3d at 856. And the State presented evidence supporting a jury finding that Jennings's intent was formed contemporaneously with, or before, Stephen concealed the body by disposing of it in Crockett County. *Id*; *see Barron v. State*, 629 S.W.3d 557, 563–64 (Tex. App.—Eastland 2021, pet. ref'd) (evidence sufficient to support tampering with corpse where defendant was aware her boyfriend had killed two men and admitted they dragged the corpses under the trailer).

10

We conclude that Jennings's tampering conviction is supported by sufficient evidence. *See Jackson*, 443 U.S. at 315–16; *Hooper*, 214 S.W.3d at 13; *Barron*, 629 S.W.3d at 563-64.

### *Aggravated Kidnapping*

A person commits an offense of aggravated kidnapping if the person intentionally or knowingly abducts another person and uses or exhibits a deadly weapon during the commission of the offense. Tex. Penal Code § 20.04(b). "'Abduct' means to restrain a person (that is, to restrict a person's movements without his consent) with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *Id*. at § 20.01(1), (2).

First, a jury could rationally find that Stephen, intentionally or knowingly abducted Torrez—Stephen restrained Torrez (that is, he restricted Torrez's movements without his consent by having him tied up)—with intent to prevent Stephen's liberation by using or threatening to use deadly force (a gun) and used or exhibited a deadly weapon during the commission of the offense (a gun). *Id*. §§ 20.01(1)(2); 20.04(b). Accomplices Dean, Navarro, and Wray testified relatively consistently about the basis of the plot and its execution; a non-accomplice, Nicky Nash testified that she saw a video of the kidnapping.

Dean testified about the plan to lure Torrez to town to do a concrete bid to keep him busy so that she could go get E.T. "without getting harmed."

Navarro testified Stephen contacted him for help. Navarro came over to the Duckworth house and was outside near his truck when Torrez pulled his own truck into the driveway behind him. When he walked Torrez into Stephen's house, Stephen had a gun. Torrez

11

tried to run, but Stephen slammed the door. Stephen walked Torrez into the east bedroom and asked Navarro to tie him up. A tarp had been laid on the floor with a chair in the middle of it; as Navarro walked into the room, the gun Stephen was holding went off, but nobody was hit. Navarro punched Torrez once, before tying him up, because he was moving around. And then he used bailing wire, duct tape, and rope to bind Torrez's hands behind his back and to secure his torso to the chair. Navarro testified that, while Stephen was in the hall, he made a video on his cell phone because, "[t]here was a gun present" and he "didn't know" what was going to happen. Navarro also took a photo of Torrez. Navarro testified that they laid the chair down on the ground. Stephen "put a towel over his—his mouth and his nose and poured water on him." They then set the chair back up. Stephen browsed through Torrez's phone. Navarro heard Stephen talking on the phone saying, "He's here. I don't know how it's going to play out."

Navarro testified he thought he was there "15 minutes, but apparently I was there two hours and 30 minutes." He admitted that he was using methamphetamine while at the house.

Angella Wray testified that Stephen told her of the plot beforehand—that they had Dean's ex coming to the house, "that he was asking him to do a job for them, basically, under false pretenses," and "that that they were—or he was going to try to get information as to where her daughter was."

Nikki Nash testified that Navarro showed her a video on his phone. The video depicted a man who was beat up, there was yelling, and someone walked in front of the camera and hit the man, and the man grunted. Navarro deleted the video after Nash told him to, but not the photo, which was shown at trial.

A rational trier of fact could have found that Stephen committed the offense of aggravated kidnapping beyond a reasonable doubt.

Second, a jury could rationally find Jennings criminally responsible for the aggravated-kidnapping offense committed by Stephen because, acting with intent to promote or assist Stephen's commission of aggravated kidnapping, he aided Stephen in committing the offense. *Id*. §§ 7.02(a), 20.04(b).

Dean testified that she, Stephen, and Jennings came up with the plot, although Stephen later changed it.

Jennings, in his statement to the Texas Rangers, admitted: that he agreed to go to San Angelo and agreed to go with Dean to Abilene to get the child; that he allowed Stephen to use his phone to text Torrez; that he understood they intended to get locations from Torrez; that he saw Navarro for about five minutes at the house and Navarro was big enough to scare Torrez; that he drove Torrez's truck to a field a mile from the Duckworth residence and later used latex gloves when he moved Torrez's truck from the field to the Wal-Mart parking lot where it was found; that he told Stephen to get rid of Torrez's keys; that the body was moved in the trunk of the Chrysler; that it was dark and late when Stephen left with the body and he told Stephen to take the body far away from San Angelo; and that he knew the general area of where Stephen dumped Torrez's body ("south of Barnhart on Highway 163. He described certain oil field[s], I believe, structures that were out in that general area.").

Wray testified that Jennings and Dean drove to her house and dropped X.T. there. Dean later came by alone, and, after receiving a phone call, "She ran out the door and I asked if he told her or told them where the daughter was, and she said yes." Dean came back with her daughter and spent the night but left early the next morning with both children before Wray was up.

13

Navarro testified that as he was walking out of the Duckworth house, Jennings was walking in, headed to the room Torrez was tied up in, and was wearing yellow dishwashing gloves. Dean testified that Jennings came out of the Duckworth house with a sheet of paper with the relevant addresses on it to help them find E.T.

The jury therefore had evidence before it that Jennings: agreed to help with the plot beforehand; came armed; was physically present at the scene of the kidnapping while armed; executed the purpose of the kidnapping by retrieving E.T. once the addresses were extracted from Torrez; and helped and advised Stephen about eliminating the evidence. *See Hinojosa v. State*, 433 S.W.3d 742, 756 (Tex. App.—San Antonio 2014, pet. ref'd) ("Here, the jury could reasonably deduce that Hinojosa was present at several stages of the kidnapping and assisted Zambrano and/or Linares along the way."). Although there were some internal and external conflicts in the testimony, resolving those conflicts was the province of the jury. *See Jackson*, 443 U.S. at 319.

The jury could find from that evidence that Jennings agreed with Stephen and Dean to commit aggravated kidnapping; that it was Jennings's conscious objective or desire for Stephen to commit the aggravated kidnapping with his and other's help; and that the agreement and conscious objective or desire were formed contemporaneous with or before the crime was committed. Again, Jennings showed up armed days before the crime was executed, and he accepted the changes of the plot as they came up. *Metcalf*, 597 S.W.3d at 856.

We find Jennings's aggravated kidnapping conviction supported by sufficient evidence. *See Jackson*, 443 U.S. at 315–16; *Hooper*, 214 S.W.3d at 13; *Hinojosa*, 433 S.W.3d at 756.

14

*Murder*

A person commits an offense of murder if the person intentionally or knowingly causes the death of an individual. Tex. Penal Code § 19.02(b)(1).

First, a jury could rationally find that Stephen intentionally or knowingly caused Torrez's death by shooting him with a firearm. The jury heard Navarro testify that Stephen had him tie Torrez up, while Stephen held him at gunpoint, and that when Navarro left, Torrez was still alive. And it heard Jennings's acknowledgments that Stephen called and said that Torrez was dead, that Jennings saw Torrez's body—with a bullet hole, and that Stephen drove off with Torrez's body in the Chrysler. A rational trier of fact could have found that Stephen committed the offense of murder beyond a reasonable doubt. *Id*.

Second, a jury could rationally find that Jennings was criminally responsible for the murder Stephen committed because: (1) Jennings conspired with Stephen to commit aggravated kidnapping; (2) in the attempt to carry out the conspiracy, Stephen committed murder; (3) the murder offense was committed in furtherance of the conspiracy; and (4) the murder should have been anticipated as a result of carrying out the conspiracy. *Id*. §§ 7.02(b), 19.02(b)(1), 20.04(b); *see Hooper*, 214 S.W.3d at 14 & n.4.

As discussed above, the jury could rationally find that Jennings conspired with Stephens to commit aggravated kidnapping. Again, "conspire," in this context, means "an agreement between two or more persons to commit a felony." Tex. Penal Code § 7.02(b). Then, in the attempt to carry out that conspiracy, and in furtherance of that conspiracy, Stephen killed Torrez. And Jennings's own words reflected his understanding that a murder should have been anticipated. He told the Texas Rangers that he had warned his son about the problem with the plan: "I told him it would go on for years and just by snatch—and by just snatching the kid it

15

wasn't going to work out. I told him it would not stop until one of them were dead." We agree that, given the facts of this case, the murder offense committed by Stephen was "reasonably foreseeable" within the scope of the unlawful agreement. *Anderson*, 416 S.W.3d at 889; *see Snow v. State*, 721 S.W.2d 943, 949 (Tex. App.—Houston [1st Dist.] 1986, no pet.) ("Appellant's contention that he did not intend to kill Winningham, which the State concedes, is irrelevant because only a conspiracy to commit robbery was necessary in order for the jury to find appellant guilty [of murder] under section 7.02(b)").

We conclude that Jennings's murder conviction is supported by sufficient evidence. *See Jackson*, 443 U.S. at 315–16; *Hooper*, 214 S.W.3d at 13; *Anderson*, 416 S.W.3d at 889; *Snow*, 721 S.W.2d at 949.

## CONCLUSION

Having overruled Jennings's jury charge and sufficiency challenges, we affirm the judgments of the trial court.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed: August 1, 2025

Do Not Publish

16